| 17 | 17 |
| 126 | 89 |
| 17 | 17 |
| 139 | 102 |
| 17 | 17 |
| 150 | 74 |
| 17 | 17 |
| 211a | ¹435 |
| 211a | ⁴436 |

---

## HUGH R. STARKEY, Plaintiff in Error, *v.* THE PEOPLE.

### ERROR TO GALLATIN.

Dying declarations are such as are made, relating to the facts of an injury of which the party afterwards dies, under the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance and without hope of escaping the impending danger.

The court should determine upon the admissibility of such declarations, upon hearing proof of the condition of mind of the deceased at the time they were made. Which proofs, it is advised, should not be taken in the hearing of the jury impanneled to try the accused.

The substance of dying declarations may be given in evidence to the jury; and, if necessary, through interpreters.

If dying declarations are permitted to go to the jury, then also may they hear the whole evidence as to the condition of mind of the deceased and other circumstances at the time they were made, and pass upon their credibility and weight.

THIS indictment was tried before BAUGH, Judge, and a Jury, at December term, 1854, of the Gallatin Circuit Court.

N. L. FREEMAN, for Plaintiff in Error.

J. S. ROBINSON, for The People.

SKINNER, J.    Starkey was indicted in the Gallatin Circuit Court for the murder of Pohlman.

He was found guilty of murder and sentenced by the court. A motion for a new trial was overruled.    A writ of error was sued out and a supersedeas awarded.

2

The several assignments of error will be noticed in their order. The first assignment questions the decision of the court in admitting the statements of the deceased made to Lawrence Izerman, as to the infliction of the wound causing his death, as dying declarations.

The testimony upon which the court admitted these declarations was substantially as follows:

*Lawrence Izerman* testified that he saw the deceased on the evening of the day he was hurt; that the deceased sent for him, as they were both Germans, and there were no Germans where the deceased then was; that the deceased showed his wound to witness, and said he was very bad and could not get through his life with it; that he must die.

The witness did not say the deceased said he must die, until the court had twice decided that the declarations were inadmissible, and after repeated questions by the prosecuting attorney and the court, the witness, who was a German and spoke through an interpreter, said deceased told him he had a dangerous wound and must die for it; the witness understood English imperfectly. He stated that deceased was in bed, calm, and spoke slowly; that the deceased did not ask for any thing to be done for him, but the persons about the house were dressing his wound.

*Dr. Corwin* testified that he was a physician, and on the Saturday afternoon after the deceased was wounded, witness went to visit a boy next door to where deceased was, and was called in to see deceased, and examined the wound externally, but did not probe the wound to ascertain its depth.

Could not say whether the wound entered the cavity. The wound was on the left breast just above the nipple. There are two symptoms to show that the cavity is entered, neither of which symptoms existed in this case, so far as witness ascertained. When witness then went to see deceased, he, the deceased, came down the stairs to the witness; the deceased could not speak English, and witness told him through an interpreter to remain quiet, and not move about. Witness did not think at that time that the probabilities were against the recovery of the patient; that he did not then think the wound mortal, if by mortal wound is meant that the stronger probabilities were against a recovery. Witness did not at any time communicate to the deceased that he would die.

Witness called again to see the deceased on the Sunday after the Saturday mentioned, when the deceased went out on the porch for witness to see him; witness upbraided deceased for not keeping quiet.

On the next day, Monday, witness saw deceased again—and again on the Wednesday following, at which last time deceased

came into the next house where witness was attending on the boy mentioned. Witness understood that on the day before, which was Tuesday, the deceased had ridden to Shawneetown, seven miles, and back, on a mule.

The wound mentioned was in a dangerous place, but witness did not communicate to the deceased any thing about it, except to caution him to keep quiet. The weather at the time was very warm, and the deceased was very imprudent in riding to Shawneetown as he did.

*Peter Baker* testified before the court, that on the Tuesday following the Thursday on which the deceased was wounded, he, the deceased, rode on a mule from the Saline mines to Shawneetown, a distance of six or seven miles, and back again. This was in July or August, 1854. The deceased then told the witness that he had come up to testify against the prisoner, so that if he should die, it would be known who hurt him. The deceased then stated to Baker the circumstances of his injury and that he feared he should not recover.

*Mrs. Day* testified that the deceased was a German working at the Saline mines, and boarded at her house; that the deceased came home to her house wounded on the Thursday night as mentioned; that he lived eight days, and died on the next Thursday night, late in the night. That witness was from home most of the day on the Thursday the deceased died, but got back before supper. The deceased was at supper and ate very heartily. She saw nothing very unusual in his appearance then—he went up stairs to bed in a room by himself, as he had done for several nights before. Witness put a cup of water by his bed and then retired for the night. The deceased made no request, but during the night she heard him walking about up stairs as he had done before since he was wounded. Witness always gave deceased what he wanted during his illness. Witness said that she noticed the mind of deceased to change on the Monday before he died, but he had his senses and talked well enough after Monday night. On that Monday night the deceased came down the stairs and passed through the room where witness was, without saying any thing, and went out of doors; he soon returned with a neighbor, who asked what was the matter, and witness remarked, nothing. The neighbor then said Pohlman, the deceased, was raving; that he, the deceased, had imagined he saw two men coming across the hill with a lantern to beat him. Witness then told the deceased that there was nothing the matter and to go to bed.

The second assignment of error questions the decision of the court in admitting, as dying declarations, statements made to Joseph Eick, by the deceased, on the afternoon of the day pre-

vious to his death.   The evidence upon which these statements were admitted was substantially the same as that upon which the statements made to Izerman were admitted, with the addition of the evidence of Eick, which was substantially as follows :

*Joseph Eick,* a German, and who could not speak English, testified, through an interpreter, that he had a conversation with the deceased about three o'clock on the Thursday afternoon before he died ; that he died the next morning about three or four o'clock ; that deceased then told him he had a dangerous wound and must die ; that deceased was much frightened at the time, and told witness that nothing could help him.   He did not say he wished to tell witness anything, but did tell witness about his hurt ; that the conversation took place at witness' house, about thirty yards from where deceased boarded ; that deceased did not appear to be in his senses, but was only nervous and short breathed ; that he was in a good deal of fright, and said he came for a kind of relief ; that deceased walked to witness' house by himself and stayed there about half an hour ; that when deceased left he shook hands with witness and said : brother, we shall not meet any more, but did not say when he expected to die.

This testimony was given through interpreters who some times differed in the words used by the witness, and the witness, before he testified, was told by the court to give the exact words of deceased, if he could, and if he could not, to give the substance of what he said.

These two assignments of error may be considered and disposed of together.   The statements of the deceased as to the cause of the injury from which death finally results, when dying declarations within the meaning of the law, are admitted in evidence on the ground of necessity, and the rule under which they are admitted, forms an exception in the law of evidence.   The accused, under the rule, has not the benefit of "meeting the witness against him face to face ;" a constitutional right in all criminal trials with this solitary exception.   He is deprived of the security of an oath attended with consequences of temporal punishment for perjury.   He is deprived of the great safeguard against misrepresentation and misapprehension—the power of cross-examination.   The evidence is hearsay in its character ; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased, and of involuntary resentment against the accused.

It is vain to attempt to disguise the infirmities and imperfections of the human mind, and its susceptibility to false impres-

sions, under circumstances touching the heart and exciting the sympathies; and the law has wisely, in case of dying declarations, required all the guaranties of truth the nature of the case admits of. The principle upon which such declarations are admitted is: that they are made in a condition so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge, or any conceivable motive to misrepresent, and when every inducement, emotion and and motive is to speak the truth. In other words, in view of *impending* death and under the sanctions of a moral sense of certain and just retribution.

Dying declarations are, therefore, such as are made by the party, relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance, and in the absence of all hope of avoidance; when he has despaired of life and looks to death as inevitable and at hand. 1 Phillips' Ev. 235; Roscoe's Cr. Ev. 29, 30, 31; 2 Starkie's Ev. 262; 1 Chitty's Cr. Law 569; 2 Russ on Cr. 683, 684; 1 Greenleaf's Ev. 156 and 158; Swift's Ev. 124; McNally's Ev. 384; Wharton's Cr. Law 308; *Montgomery* against *The State*, 11 Ohio 424; *State* v. *Moody*, 2 Haywood 189; *Smith* v. *The State*, 9 Humphrey 17; *Rex* v. *Van Butchell*, 3 Car. & Payne 495; *Nelson* v. *The State*, 7 Humphrey 583; *McDaniel* v. *The State*, 8 Smedes and Marsh. 415; *Hill's case*, 2 Grattan 608; *Campbell* v. *The State*, 11 Geo. 374; *The People* v. *Knickerbocker*, 1 Parker's Cr. R. 306; *The same* v. *Green*, Ibid 11.

It is for the court in the first instance to determine upon the admissibility of the declarations, upon proof of the condition of mind of the deceased at the time they were made; and if the proof does not satisfy the court beyond reasonable doubt, that they were made in *extremity*, and that they are dying declarations within the law, they should not be permitted to go to the jury. There can be no question that, tested by the principles here laid down, the declarations made by deceased to Izerman are not dying declarations, and we proceed directly to examine as to the declarations made to Eick.

Taking the words of the deceased, that he "had a dangerous wound and must die," and the remark, on parting with Eick, "that they would never meet again," without looking to the attending facts and circumstances we should unhesitatingly conclude that the impression was upon his mind that he soon should die.

The mere declarations or statements of the deceased as to his condition and expectation are not the only test from which to ascertain his true state of mind in this respect, but the court

should look not only to his language but to all the facts existing and surrounding the party at the time, before and after the declarations were made, forming the *res gestæ* and tending to show his true state of mind.

Words alone are too uncertain and unreliable, and recourse must be had for more satisfactory elucidation, to the attending facts and circumstances.  These are: that the deceased had received the wound eight days previous to his death; that on the day he was wounded he stated that he must die; that he returned to his boarding place, and that some three days after a physician, being in attendance on a sick person near by, was called to see him; that deceased came down stairs and met the physician; that the physician, some four days after the injury, again saw deceased, and again on the day before he died; that the physician did not find the ordinary indications of a mortal wound, and did not regard the wound mortal; that he did not inform deceased that his wound was dangerous, but upbraided him for imprudence in going about; that deceased, on the Tuesday preceding the Thursday on which he died, rode on a mule in very warm weather some seven miles and back, and then stated to Baker that he feared he should not recover; that during his illness he was accustomed to walk about; that on the day before he died he walked to Eick's and returned the same way; that the evening before he died, and after being at Eick's, he went to supper with the family and ate very heartily; that he stated to Izerman, on the day of the injury, that he must die, when all the attending circumstances exclude the idea that he then was without hope of recovery; that he attempted no known preparation for death, and made no arrangements concerning family, friends, or property, although he had abundant opportunity.

From all this we do not doubt that the deceased, at the time he made the statements to Eick, had serious fears that he would not recover, but that he regarded himself a dying man and was without hope of recovery, we are not satisfied; nor do we think the proof justified their admission as dying declarations.

The danger of sacrificing innocence to too great credulity where the human sympathies are wrought upon, and where the evidence, in its very nature, must be without the most reliable guaranties of truth, admonishes us that it is better to err in favor of than against life.  The third assignment of error challenges the decision of the Circuit Court in permitting witnesses to state the substance of what the deceased said as to his apprehensions of death, and in admitting the same through interpreters who sometimes differed in their rendition of German words into English.  In this we find no error.

A denial of testimony through the medium of interpreters where the witness cannot speak the language of the court, or to require the witness to give the exact words of another, would often be equivalent to a denial of justice. However desirable in a case like this it may be to obtain the very words of the deceased, and to obtain them directly from the witness who heard them spoken, to avoid misapprehension and perversion, yet such a requisition would assume a perfection in the administration of justice unattainable by human tribunals.

A conscientious witness will rarely undertake, under oath, to give the exact words of another spoken at another time and on a different and remote occasion. The substance of the words, if the exact words cannot be given, is all the law requires. *Montgomery* v. *The State*, 11 Ohio 424 ; *Nelson* v. *The State*, 13 Smedes and Marsh. 500.

And this is consistent with the analogies of the law in proof of admissions and confessions. *Iglehart* v. *Jernegan*, 16 Ill. 513. The Circuit Court refused to allow the prisoner to prove to the jury the statements of the deceased as to his apprehension of death, and also to prove his conduct and state of mind at the time of making the declarations, held by the court to be dying declarations. And upon this decision arises the fourth assignment of error.

It is admitted that it is for the court, in the first instance, upon a preliminary examination, to decide upon the competency or admissibility of the declarations.

The declarations, however, being admitted, the whole evidence, including that heard by the court as to the condition of mind of the deceased at the time they were made, should then go to the jury, to enable them advisedly, and from all the lights the facts and circumstances afford, to determine upon the credibility, weight and force of the evidence.

The condition and state of mind of the deceased, with all attending circumstances bearing upon the question, are proper for their consideration ; and there is no ground upon principle or authority for excluding from their consideration the statements of the deceased as to his apprehension of death, nor of the surrounding circumstances forming the *res gestæ* and tending to establish the existence or non-existence of that condition of mind which would constitute his statements as to the cause of the injury in law, dying declarations. 1 Greenleaf's Ev. 160 ; 1 Phillips' Ev. 238 ; 2 Starkie's Ev. 263 ; Roscoe's Cr. Ev. 34 ; *Lambert* v. *The State*, 23 Miss. R. 355 ; *Nelson* v. *The State*, 13 Smedes and Marsh. 506 ; *State* v. *Thawley*, 4 Harrington 562.

It is a legal maxim, " that the law is for the court and the facts for the jury ;" and as a general rule, where the question

involves both law and fact, the jury must determine the question upon the facts by them found, under the law as pronounced by the court, but subject of necessity, to the final judgment of the court on motion for a new trial.

From the province of the jury to determine upon the credibility, weight and effect of the whole, or any part of the evidence, it follows, that they may take into consideration the state of mind and actual condition of the deceased as to his apprehensions of impending dissolution, and give to the declarations such weight as to them they seem to deserve.

In England, as late as 1789, it was held that the question as to whether the declarations were dying declarations, was a mixed question of law and fact to be determined by the jury under the law as given them by the court, without a preliminary examination and decision by the court. *Woodcock's case*, Leach's Crown Law 500. Afterwards it was held to be a question for the court and not for the jury, and to be determined as a mere question of competency. *Melbourne's case*, 1 East's Pl. of the Crown 358.

The great caution sanctioned by the books in regard to this kind of evidence, would seem to demand a rule of practice uniform, free of embarrassment and nice distinction, and which in its operation will not deprive the jury of any fact or circumstance tending to enlighten them upon the main point of inquiry, — the guilt or innocence of the accused. We are therefore inclined to adopt the rule laid down in *Campbell* v. *The State of Georgia*, 11 Geo. R. 353; *The People* v. *Green*, 1 Parker's Cr. R. 11; *The State of Wisconsin* v. *Cameron*, 3 Chandler's R. 172, and substantially recognized in many other cases, that the question of the competency of the alleged dying declarations as evidence, is in the first place to be determined by the court upon a preliminary examination, and the declarations being admitted to the jury, it is for them upon consideration of the whole evidence, including that heard by the court upon the question of competency, and in determining upon the guilt of the accused, to take into consideration the state of mind of the deceased as to his apprehension of death, and finally determine this, and consequently the force of the declaration, as any other question of fact, under the law as given them by the court.

It is also assigned for error, that the Circuit Court heard the evidence upon the preliminary examination as to the state of mind of the deceased, involving the admissibility of his declarations as to the injury, in the presence and hearing of the jury, and against the objection of the prisoner.

Upon this record we are not compelled to decide upon this ruling of the court; but the impossibility of knowing what

effect upon the minds of the jury the hearing of this examination might have, or what tinge or coloring it might in their minds give to other evidence against the accused, in case the declarations should not go to them finally as evidence, would suggest the propriety of sending the jury out in charge of a sworn officer, pending this examination.

And this practice has been approved wherever the question, to our knowledge, has arisen. *Hill's case*, 2 Grattan 611; *Smith* v. *The State*, 9 Humphrey 17.

Judgment reversed and cause remanded for a new trial.

*Judgment reversed.*

---

SCATES, C. J. I am of opinion that the evidence on the preliminary examination before the court was sufficient to show the competency of the statements of deceased last made, as dying declarations.

It is with great doubt and hesitancy that I concur in admitting the same facts, circumstances and declarations of the deceased, offered to the court, on the questions of competency, to be again proven before the jury, for the purpose of impeaching the testimony of deceased, by showing the non existence of the very point determined by the court on the question of competency; that the deceased made them under the conscientiousness and apprehension of impending dissolution, which is, in law, substituted for an oath. I regard the contrary doctrine to be supported by the current of authorities and general practice, but put my concurrence in the authorities cited, and the opinion of the court upon a tender regard for life.