JAMES M. TRACY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield November 26, 1880.*

1. EVIDENCE *in criminal cases—cross-examination.* On the trial of one for murder, in applying the rules governing the production of testimony, all matters of doubt should be solved in favor of the accused, and anything throwing light upon the subject of inquiry tending to exculpate the accused, ought to be admitted freely, without drawing the lines too tightly on cross-examination of the People's witnesses.

2. Where the right of cross-examination as against the accused is unwarrantably restricted, and the greatest latitude accorded to the People, so that improper evidence is allowed for the prosecution, and the accused is denied the right to ask proper and relevant questions on cross-examination, a judgment of conviction will be reversed.

3. On a trial for murder the prosecution proved by a witness that just before the difficulty he saw the deceased go into the office of the accused, and that before going in the accused had hailed him from the window by the title of " Sooner," which the evidence showed was used and understood in an offensive sense. The witness also testified that there had been before that time some difficulty between the accused and deceased about their matters. On the cross-examination the defence asked this preliminary question : " Tell the jury whether you had noticed Whitcomb (the deceased) about the office some days before that ? " to which the court sustained an objection: *Held,* that the question was proper and the court erred in refusing to allow it to be answered. It was proper as negativing the hypothesis that the deceased had gone into the office of the accused on account of the supposed insult, and tended strongly to disprove the alleged fact.

4. In the same case a brother of the deceased was introduced by the People for the purpose of identifying the written statement of the deceased which was subsequently admitted in evidence as a dying declaration, and also to show the circumstances under which it was made. On cross-examination he was asked, if during a conversation of which he, had spoken as having occurred immediately before the written statement was made, or if during any conversation had with the deceased after that conversation, the deceased used profane language, which the court refused to allow the witness to answer: *Held*, that so far as this language related to the conversation of which the witness spoke in his examination in chief, there could be no doubt of its propriety, and that the question was also proper as tending to negative the assumption that the deceased, at the time of making the statement, was rational and had no hopes of life, and was not actuated by malice or revenge.

5. EVIDENCE—*conversation—other party entitled to whole of it.* Nothing is better settled than, if a witness testifies to a part of a conversation, that the party against whom it is offered is entitled to have all that was said on the same subject in that conversation.

6. DYING DECLARATIONS—*requisite preliminary proof.* Before a written statement is admissible in evidence as dying declarations, it must be shown that the deceased at the time of making it was in possession of his memory and mental faculties to such an extent as to understand the nature of the business in which he was engaged, and to be able to give a true and correct account of the facts to which the statement relates, and it must also be made to appear that it was made under a fixed belief and moral conviction that death was then impending and certain to follow almost immediately, and otherwise under such circumstances as to exclude the supposition that the declarant in making it was influenced by malice, revenge or any conceivable motive to misrepresent the real facts.

7. When dying declarations are offered in evidence, it is competent for the accused to show by cross-examination of the People's witnesses, or by other witnesses, that the deceased in making the statements was in a reckless, irreverent state of mind, and entertained feelings of malice and hostility towards the accused, and proof of the indulgence in profane language at or about the time of making the statement is clearly competent for that purpose.

8. PRACTICE—*general objection to evidence—of its effect.* . A general objection to a question propounded to a witness must be regarded as going to the competency of the testimony sought and not to the form of the question, and if the testimony sought to be elicited is pertinent and competent, it is error to sustain such an objection.

WRIT OF ERROR to the Circuit Court of Champaign county ; the Hon. C. B. SMITH, Judge, presiding.

· Messrs. A. W. and H. W. AYERS, and Messrs. SOMERS & WRIGHT, for the plaintiff in error.

Mr. M. W. MATHEWS, State's Attorney, Mr. E. L. SWEET, and Mr. M. B. THOMPSON, for the People.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

The grand jury of Champaign county, at the September term, 1879, of the Champaign circuit court, indicted James M. Tracy, plaintiff in error, for the murder of Alva H. Whitcomb. The cause was tried at the same term of court, resulting in a verdict of guilty of manslaughter, and fixing his punishment by confinement in the penitentiary for a period of twenty-five years. Motions for a new trial and in arrest of judgment were severally overruled and final judgment rendered by the court upon the verdict, to reverse which this writ of error is prosecuted.

By the first assignment of error it is claimed that the court upon the trial excluded proper testimony on behalf of the accused, and admitted improper testimony on behalf of the People. Under this general assignment plaintiff in error complains that the right of cross-examination as against the accused was unwarrantably restricted, while the greatest latitude was accorded to the People. Upon a careful examination of the rulings of the court upon which this complaint is based, we are satisfied that it is not altogether groundless. The liberty and life of the accused were involved in the issue, and in applying the rules governing the production of testimony all matters of doubt should have been solved in his favor. Whatever would have thrown any light on the subject of inquiry tending to exculpate the accused was of vital importance to him, and he should not have been embarrassed in his efforts to present it to the jury by drawing the lines too tightly upon the right of cross-examination.

Of all the tests which the law has provided for the ascertainment of truth, the right of cross-examination is justly

deemed the most powerful and efficacious. Courts therefore, while guarding against any abuse of this right, watch with zealous care any attempt to invade or restrict it.

We do not propose to go to any great length into the details of the complaint under this assignment of error, but will merely call attention to one or two of the rulings of the learned judge who presided at the trial, as an illustration of a number of instances of the same character, in which we are of opinion that the right of cross-examination was improperly restricted.

B. F. Michael, a witness on behalf of the People, testified that just before the difficulty he saw the deceased go up the stairway and into the office of the accused, and knew from the motion of his lips he was engaged in conversation with him, and that immediately before his going up to the office the accused had hailed him from the open window of the office by the title of "Sooner," which the evidence tends to show was used and understood in an offensive sense. This witness further testified that he knew there had been before that time some difficulty " about their matters." Now, inasmuch as it was evidently the purpose of the prosecution by this evidence to show that the deceased entered the office on account of the term " Sooner" having been applied to him from the window, it was highly proper to show, if such was the fact, that the witness knew that the deceased was in the habit of going into the office when no such reason for doing so existed, and the accused had an unquestionable right to call out this fact on cross-examination.

Such evidence would to some extent have negatived the hypothesis that the deceased went into the office on account of the supposed insult, and would also have strongly negatived the testimony of the witness to the effect that there was an existing difficulty between the parties "about their matters." With the view, doubtless, of calling out what the witness might know upon this subject, he was asked by counsel for the accused on cross-examination this preliminary question:

"Tell the jury whether you had noticed Whitcomb about the office some days before that?" The court, for some unaccountable reason, upon objection by the People, would not permit the witness to answer it, and this was error.

Again, on the cross-examination of E. T. Whitcomb, a brother of the deceased, who had been introduced by the People for the purpose of identifying the written statement which was subsequently admitted in evidence, and also for the purpose of showing the circumstances under which it was made, was asked if, during a conversation of which he had spoken in his examination in chief as having occurred immediately before the written statement was made, or if during any conversation had with the deceased after that conversation, the deceased used profane language.

On objection by the People's counsel the court refused to allow the witness to answer this question. So far as this inquiry related to the conversation of which the witness spoke in his examination in chief, there is not the slightest doubt of its propriety. Nothing is better settled in the whole domain of the law, than if a witness testifies to a part of a conversation, the party against whom it is offered is entitled to have all that was said on the same subject in that conversation. And it was especially important to the accused in this case, if the deceased had used language of the character sought to be elicited by the question, that it should be called out and considered by the court. The vital inquiry before the court was as to the real condition of the mind of the deceased when making the statement then under consideration. Before it was admissible in evidence it was necessary to show, from the evidence then being adduced, that the deceased was at the time sufficiently rational to make the statement in question, and that it was made under a sense of impending dissolution. Assuming that the deceased was a believer in a future state of rewards and punishments, and such is the presumption where nothing appears to the contrary, the use of profane language immediately preceding the statement is hardly to be recon-

ciled with the assumption that he was· at the. time of sound mind and impressed with a sense of almost immediate death. To say the least of it, it was a fact which, if proved, would have tended strongly to negative that hypothesis, and should therefore have been received and considered by the court in connection with the other facts and circumstances bearing upon the question. It is hard to realize how any ·sane man who believes in his accountability to God can be indulging in profanity when at the same time he really believes that in a few short hours at most he will be called upon to appear before Him to answer for the deeds done in the body.

· But outside of this, the fact sought to be shown was important in another point of view. It strikes at the very foundation of the reasons upon which dying declarations are admitted at all. There are certain guaranties of the truth of dying declarations, growing .out of the solemnity of the time and circumstances under which they are made, which, in contemplation of law, are supposed to compensate for the fact they are not sanctioned by· an oath, and the party against whom they are used has had no opportunity to cross-examine. But when it is affirmatively shown that.the declarant in making the statement was not actuated by the motives and influences which the law contemplates, or where, upon the whole of the evidence, there is a reasonable doubt of this fact, the statement should be excluded; for in such case it would be without those guaranties for its truth which the law contemplates. This subject was fully considered in *Starkey v. The People,* 17 Ill. 17. We there said : " The principle upon which such declarations are admitted is, that they are made in a condition so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge, or any conceivable motive to misrepresent, and when every inducement, emotion and motive is to speak the truth. In other words, in view of *impending·* death, and under the sanctions of a moral sense of certain and just retribution. Dying declarations are, therefore, such as are made by the

party, relating to the facts of the injury of which he after-wards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost imme-diately, without opportunity for repentance, and in the absence of all hope of avoidance; when he has despaired of life, and looks to death as inevitable and at hand."

· Now, since the value of such a statement as an instrument of evidence depends entirely upon the presence of the requisite conditions so clearly defined in the case just cited, it would be manifestly unjust to the accused in any case to refuse him permission to show these conditions were wanting in the particular statement by which he is sought to be affected.

It was therefore clearly the right of the accused in this case to call out, upon cross-examination, any fact within the knowl-edge of the witness which was either a part of the conversation of which he had spoken in his examination in chief, or which was connected with the subject-matter of that conversation, that would tend to show that the deceased in making the statement was not in that frame of mind which the law pre-supposes and requires in such cases. Or, in other words, it was competent to show on the cross-examination of the wit-ness in question that the deceased, in making the statement, was in a reckless, irreverent state of mind, and entertained feelings of ill will and hostility towards the accused. And it must be conceded that proof of the indulgence in profane language at that time, as contemplated by the question, was clearly competent for that purpose.

· The question was proper and should have been answered, and to refuse to admit it was error.

It was a part of the theory of the defence that, by reason of the excessive use of chloroform, the deceased was not sufficiently rational at the time of making the statement to warrant its admission in evidence. In support of this theory Dr. Miller was introduced as a witness on behalf of the accused. After having stated that he had been a physician for 27 years, and was acquainted with the medical properties of chloroform, he

was asked this question: "Under ordinary circumstances how much chloroform is necessary to put a party under its influence by inhalation?" Upon objection by the People, the question was disallowed by the court, and the defendant excepted. The question was clearly a proper one, and should have been answered. It is true that it was not as specific as it might have been, but it was not objected to on that ground; or at least if it was the record does not show it, and we must therefore presume that the court, in disallowing the question, did so on the hypothesis that the answer sought to be elicited was not pertinent to the issue, and this was error. The question as asked was equivalent, in substance, to the general question: "What is an ordinary dose of chloroform, taken by inhalation?" and we see no well founded objection even to the form of it. But as before remarked, the objection must be regarded as going to the competency of the testimony sought, and not to the form of the question, since nothing appears from the record to the contrary.

The record discloses other rulings of the court upon questions of evidence equally as unfavorable to the accused as those we have noticed, but we do not deem it necessary to specially consider them, as it is believed the views we have expressed with respect to those already considered are amply sufficient to illustrate the principles by which all should be controlled.

The third error assigned questions the correctness of the ruling of the court in admitting the written statement to go to the jury as dying declarations. Before it was admissible it must have appeared from the evidence that the deceased, at the time of making it, was in possession of his memory and mental faculties to such an extent as to understand the nature of the business in which he was engaged, and to be able to give a true and correct account of the facts to which the statement relates; and it must also have further appeared, as we have just seen, that it was made "under a fixed belief and moral conviction that death was then impending and certain

to follow almost immediately," and otherwise under such circumstances as to exclude the supposition that the declarant, in making it, was influenced by malice, revenge or any conceivable motive to misrepresent the real facts. Keeping in view these plain requirements of the law, let us look at the facts for a few moments.

The affray in which Whitcomb lost his life occurred in the office of the accused between two and three o'clock in the afternoon of Monday, the 11th of August, 1879. Immediately after the difficulty, he was taken to a neighboring drug store, where he remained about a couple of hours, when he was removed to his mother's house and laid upon a bed. During the time he remained at the drug store his attending physicians, Drs. Brown, Lindley and Fugate, had kept him under the influence of opiates and chloroform to a considerable extent. But after his removal to the house, with the view of getting him in a condition to make a statement with reference to the difficulty, the use of these drugs was partially, if not altogether, discontinued until after it was made.

E. T. Whitcomb, the brother of the deceased, testifies that after his removal to the house and just before the making of the statement, Drs. Brown, Lindley and Fugate came in, and that the deceased said to them: "Now, boys, how is it; am I going to get well?" Dr. Fugate said, "You can't get well," and he (the deceased) said, "Oh hell;" that he asked Lindley first, and then asked Brown, and the three said, "You can't get well," when he said in reply, "I bet you $100 I will;" that in a few minutes afterwards Dr. Howard came in and examined him, and seemed to say something to him which the witness did not hear, after which the deceased said to him: "Ed., I can't get well, or I can't live, and I want to make a statement," and that thereupon the statement was made.

Dr. Brown, a witness for the People, in speaking of the same matter, among other things, said: "He (the deceased) was at the house about fifteen minutes or half an hour before

statement was taken; sometimes he would say he thought he would live; in some instances he used profane language. Some one asked him a question, 'Did you see a knife in Tracy's hand when you entered the room?' His reply was: 'Hell, no; if I had, you would have seen me making a straight coat tail around the corner.' Then, almost continuously in the same conversation, some one said: 'You had Tracy down when the boys rushed in, or when Webb rushed in, you had him down where you could have hurt him.' He said: 'Yes, and if I had had horse sense,' or something like that, 'and fastened the door, we could have had it out there among ourselves, and Tracy would have been sleeping in the valley.' And when there would be a question propounded he would answer. During the statement he said once: 'For God's sake give me some chloroform, or you will have a first class corpse here.' At the drug store he said: 'You are a hell of a set of doctors that you will let a man die with these few cuts.'"

Dr. Howard, who was also a witness for the People, in speaking of his interview with the deceased at the bedside, which was referred to by E. T. Whitcomb, the brother of the deceased, testifies that when he first examined him carefully the deceased remarked: "I am going to cheat you doctors— I am going to get well," and that he replied to him: "I hope you will, but I don't see any chance for you;" that he then went back and talked with the other doctors, and came back " and told him there was no possibility, or no probability, no chance for him." Whereupon the deceased replied: "If you say I can't live, I *suppose* I will have to give it up."

Dr. Lindley, another witness for the People, speaking of the same matter, gives his reply in these words: "If you all say I must die, I *reckon* I must." This last witness also testifies that when at the house all the doctors told him he could not live, he said: "You are a hell of a set of doctors not to help a fellow with as little cuts as these." This witness further testifies: " Mathews dictated questions

and McCullough wrote them, and then they were answered; there was considerable talk going on; I would not say all he said was put in the statement; he talked to me about the scrape; there was something said about whether he would die; he said, 'I will get well and fool you all, anyway.'" This was after Dr. Howard came, and after he was told he must die, and said he must give it up. During the time these questions were being written down, he turned to me and says: "If I hadn't been such a damned fool and closed that door, he would be sleeping in the valley now;" that was while they were getting ready to frame a question; he had answered something about it before that time, I think; this was not put in the declaration. In that conversation he said to Ed., 'What will you do if I die; will you hang the damned son of a bitch?'"

Abbey Whitcomb, a sister of the deceased, swears that some time during the afternoon that the statement was made, and she thinks after it was made, the deceased said "he would meet Tracy in hell and have it out with him there."

If the recollection of the witness is correct with respect to the time this language was used, it must have been made very shortly after the making of the statement, and it must be conceded that the language used tends strongly to show that the deceased at that time entertained very hostile and vindictive feelings toward the accused.

Dr. Brown further testified that the deceased, before making the statement, said to friends present he wanted to make a statement; he wanted them to know the truth of the matter; he wanted "to hang the damn cuss."

The foregoing testimony, to which we have called special attention, was elicited exclusively from the witnesses for the prosecution, including the brother and sister of the deceased. In the main it is the testimony of the attending physicians, who are evidently men of learning and experience in their profession, and it is therefore reasonable to suppose that they would be less liable to fall into error or misapprehension as

to what actually did occur, by reason of undue excitement, than those witnesses unaccustomed to such trying circumstances.

It is true there is some little conflict in the testimony as to what was really said by the deceased, yet no more than might reasonably be expected under the circumstances. Indeed, the conflict in the main is rather apparent than real, growing out of the negative character of some of the testimony.

In addition to the case made by the People's witnesses, the accused introduced and examined as a witness William B. Webber, who testified that he had a conversation with the deceased on the morning after the difficulty, in which he, in answer to the question whether he thought he would get well, replied: "Yes, yes, yes, I am going to get well; these doctors are trying to convince me to the contrary, but I can't see it in that light; I think I shall get well."

In the light of all this evidence it is difficult to see how the conclusion can be maintained that the statement in question was made under a fixed belief and moral conviction that death was impending and certain to follow almost immediately, or that it was made under such circumstances as to exclude the hypothesis that the deceased, in making it, was influenced by malice or revenge.

In our judgment it can not be done. The weight of the evidence clearly shows the contrary, and the statement, therefore, should have been excluded from the jury.

For the errors indicated, the judgment of the court below is reversed, and the cause remanded for further proceedings in conformity with the views here announced.

*Judgment reversed.*

SCOTT, J.: I do not concur in this opinion.