(No. 15566.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL T. ZACHARY, Plaintiff in Error.

*Opinion filed December 19, 1923.*

1. CRIMINAL LAW—*when statement is admissible as a dying declaration.* A statement by the deceased relating to the facts of the injury of which he afterwards dies, and made under the firm belief and moral conviction that immediate death is inevitable, without opportunity for repentance and without hope of escaping the impending danger, is admissible as a dying declaration, notwithstanding the deceased was not informed by a physician as to the seriousness of his condition.

2. SAME—*when statements are not admissible as a part of the res gestæ.* In a prosecution for murder, parties who were so far away from the scene of the crime that they could not hear the words of the altercation between the defendant and the deceased, and whose view of the fight was obstructed, are not bystanders, so as to make their statements admissible in evidence as a part of the *res gestæ.*

3. SAME—*when it is not prejudicial error to refuse to exclude entire testimony of character witness.* In a murder trial the statement of a character witness that he had heard talk of the defendant violating the law ten years or more before the trial ought to be excluded for remoteness, but where there is no specific request to exclude this incompetent statement it is not prejudicial error to refuse to exclude the entire testimony of the witness, whose opinion of the defendant's bad reputation is based on other more recent facts, and where there is much evidence *pro* and *con* on the question of the defendant's general reputation as a peaceable and law-abiding citizen.

WRIT OF ERROR to the Circuit Court of Scott county; the Hon. E. S. SMITH, Judge, presiding.

WILLIAM N. HAIRGROVE, and WILLIAM T. WILSON, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CARL E. ROBINSON and L. A. MEHRHOFF, State's Attorneys, JAMES B. SEARCY, and WALTER W. WRIGHT, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Samuel T. Zachary, plaintiff in error, (hereinafter referred to as the defendant,) was indicted in the circuit court of Morgan county for the murder of Charles Luther Crawford. A change of venue was granted the defendant and the cause was tried in the Scott county circuit court and resulted in a conviction for manslaughter. Motions in arrest of judgment and for a new trial were overruled by the court and judgment was entered on the verdict. The defendant has sued out this writ of error to review the judgment.

The facts are substantially as follows: On November 16, 1921, the day of the homicide, the defendant, who was then seventy-three years of age, resided on his farm about eleven and one-half miles southeast of Jacksonville. He had lived in that vicinity for over fifty years. Some time prior to November 16, 1921, he suffered a stroke of paralysis, which affected his speech and the use of his right arm and disabled him generally. Charles Luther Crawford, the deceased, owned and resided on a small tract of 15 acres cut out of the northwest corner of the 160 acres of land upon which the defendant resided. Russell Crawford, a son of the deceased, also lived on his father's 15-acre tract in a house a short distance from his father. Prior to the homicide there had been circulated throughout the neighborhood statements that Russell Crawford had forged a check on the defendant. The deceased a few weeks previous to the homicide had gone over to the defendant's place and in the

presence of Lloyd Cox had talked with the defendant in regard to the statements that had been made concerning his son, and the defendant there told him that his son had admitted to the defendant's son that he had stolen some parts off of an automobile in Zahn's garage. There was nothing said concerning the alleged forgery. After this conversation the deceased left, and as he was leaving said to the defendant, "We all have our troubles and I will see you again; I will see you again, Uncle Sam." The deceased did not appear to be angry and they apparently parted on good terms. On the day of the homicide the deceased, accompanied by his wife, his brother, his son and Albert Filley, drove to Jacksonville and remained there until about two o'clock in the afternoon. The grand jury was in session and was investigating the charge of forgery against Russell Crawford. The deceased and his party remained at the court house until noon and learned that the charge of forgery against Russell Crawford had been dropped and that no indictment would be returned by the grand jury. The men in the party then had lunch. The deceased discussed the charge of forgery against his son and remarked to those he talked with that his boy had been cleared of the charge of forgery. Some of the persons to whom the deceased talked testified that the deceased said that he was going out to the defendant's house and that the defendant had to apologize to his boy. Others testified that the deceased simply said that he thought that the defendant ought to apologize to his son for the trouble he had caused him. None of these witnesses testified that deceased threatened to do any actual violence to the defendant. One of the witnesses testified that he at that time could smell liquor on the deceased's breath when he was doing this talking to him. The deceased and his party left Jacksonville about two o'clock for their home in the deceased's car and he was driving. It had rained the night before and that morning

and the roads were muddy. They drove to the home of Elmer Crawford, about three-quarters of a mile north of Russell Crawford's home, and then drove to Russell's home, at which Russell and Filley stopped, the deceased and his wife then driving to their home. The deceased changed his clothing and returned to Russell Crawford's home, where Russell and Filley were at work putting a new tire on an automobile standing about seventy feet east of the intersection of the north and south and east and west roads, at a point which would place a certain machine shed in direct line between them and the place where the homicide took place. About the time the party in the automobile arrived at Russell Crawford's house, C. F. Duffer, a neighboring farmer, and his small son, stopped at Russell Crawford's on their way to meet Duffer's children returning from school. Russell Crawford and Filley were at work putting on the tire, and Duffer, his small son and the deceased were standing near by. Norman Aulabaugh, driving an oil truck going west, drove up and stopped his truck just north of the machine shed. Russell Crawford, Filley, Duffer and the deceased went to the oil truck and engaged in conversation with Aulabaugh. They were thus engaged when Duffer's small boy called to them and said, "There comes old man Zachary down the road with a gun under his arm." After the Duffer boy had announced the approach of the defendant the deceased walked out to the north and south road and shouted to the defendant, "Come up this way, Uncle Sam; I want to see you a minute." The deceased and the defendant then started walking toward each other and met about fifty yards south of the machine shed, the deceased having gone about three-fourths of the distance between them. As the deceased approached the defendant he made some comment upon the weather, according to the testimony of the witnesses who were at the machine shed. No part of what happened after the meeting of the deceased and the defendant was witnessed by any of the men at

the oil truck except Duffer and Filley, as the machine shed was between them and the two parties in the conflict. They did hear the voices of the deceased and the defendant and knew they were quarreling or arguing but could not hear well enough to distinguish the words used by either of them. The driver of the oil truck went out into the road to see them, and testified that they were standing about four or five feet apart and talking in loud tones and gesturing with their hands and waving their arms. He then went back to the truck and in about five minutes thereafter heard the first shot fired. Duffer, one of the parties at the oil truck, testified for the People that he saw the deceased and the defendant during the entire time they were standing in the road, and that he did not see the deceased lay his hands on the defendant or do anything to him, and that when they turned to leave each other, and after the defendant had walked away about twenty-five or thirty feet, he turned and commenced firing at the deceased, and that after the first shot was fired the deceased asked the defendant not to shoot him any more. The witness Filley, for the People, testified that after the first three shots had been fired he saw the defendant take two steps toward the deceased, who had fallen out of his sight behind a bank on the roadside, and fire his gun in the direction he had seen the deceased fall. He measured the distance between the place where he thought the defendant was standing and where the deceased lay and stated it to be eleven and one-half feet. Crawford was found lying face downward in a ditch by the road. The shots struck Crawford principally on the arms, abdomen and chest. He died of the wounds in the evening of the day he was shot. The attending physician stated that in his judgment the wound in the left arm was the mortal wound, although one charge of shot had struck the right arm, and that there were between seventy-five and a hundred scattering shot in his chest and abdomen, which appeared to have struck deceased directly from the front and

some from an angle but that there were no shot wounds in his back.

The defendant testified that on the afternoon of the day of the homicide he left his home, which was on the east side of his farm and southeast of the Crawford farm, and went westerly across his farm to the north and south road on the west side of his farm; that he was going to see one of his tenants over there and took with him his gun, a pump shot-gun, to hunt for rabbits on his way; that as he came to the road he turned north for a short distance and was just entering a gate on the west side of the road, about 250 feet south of the intersection of the roads, where the machine shed was situated; that at that moment the deceased stepped out into the road and called to him, saying: "Come up this way, Uncle Sam, I want to see you a minute;" that he and the deceased then started walking towards each other and met about fifty yards south of the machine shed; that as they got near together the deceased said to him that his boy had come clear, and that he, the defendant, must apologize for what he had said. The defendant then further testified as to what took place between them substantially as follows: He stated to the deceased that he did not want any trouble with him and turned to leave him, but that the deceased, who was a large and strong man, grabbed him by the collar from behind, taking hold of both his shirt and coat collar, and began pushing him backwards and forwards and choking him. The deceased also cursed him and called him vile names, and continued to shake him backwards and forwards and to hold him by the collar in such a manner as to choke him. The deceased also struck him with his fist in the face and on the neck. The blows drew the blood from his face and bruised his neck. The button on his shirt pulled off and he freed himself from the deceased's grasp and started to back away. The deceased started towards him again, and he, the defendant, then raised his gun and fired without taking

sight. His gun was a twelve-gauge repeating shot-gun, and he fired it three times as fast as he could pump it. After he fired the third shot he stood still in the middle of the road while the deceased walked towards the side of the road and into a shallow ditch and reached down as though he was going to pick up something, and that he then fired the fourth shot and the deceased fell into the ditch. He, the defendant, then climbed through the fence and started towards home, and in attempting to adjust his gun it was again accidentally discharged. He then went directly to his home and with his daughter started to Jacksonville to surrender himself to the sheriff and was met on the road by the sheriff and his deputies.

The sheriff had already gotten word of the shooting, and testified that when he met the defendant he took charge of him; that at that time the button was off of defendant's shirt collar and the shirt was open at the neck; that he had several small scratches on his chin and that blood was oozing from the scratches, and that the defendant called his attention to the condition of his shirt and to the scratches on his chin and said to him, "That man had me by the throat and called me some bad names." The People introduced testimony to show that there were a number of briars growing where the defendant crossed the fence after the shooting, and they argue that the scratches on his chin were from the briars or made by the barbed wire in the fence.

The court admitted in evidence what is termed a dying declaration, which, as testified to by a witness, was in this language: "I begged the old man not to do it, and it was all about the boy, and he is innocent. The boy is innocent. I am going to die. Bury me at Sulphur, boys, and put me away right." The witness that testified to this dying declaration testified that he arrived at Russell Crawford's home shortly after the shooting and saw deceased lying on a cot in front of Russell Crawford's house, and that the deceased said to him that he was going to die; that he recognized

his (the witness') voice and was blind and could not see him; that as they were lifting the deceased into the automobile to take him to the hospital he made the dying declaration to him and E. C. Samples. The witness Samples testified that the deceased said to him as he was lying on a quilt in the road at the place he was shot, and a few minutes before he made the statement above quoted: "El, I want you to get something and finish killing me. I am going to die. I am suffering so much."

While the evidence is conflicting as to what occurred between the deceased and the defendant at the time of the shooting, yet it is not possible for this court to say that the evidence did not warrant the jury in finding the defendant guilty of manslaughter. The defendant's own testimony does not even make a clear case of self-defense, or a defense that the defendant shot and killed the deceased under the honest conviction that it was necessary for him to do so in order to prevent him from receiving great bodily harm or the losing of his life. After reviewing the evidence in this record we are strongly impressed with the conviction that the defendant ought to feel that he had been dealt with leniently by the jury and that he was fortunate in the fact that the jury did not return a verdict of murder. The evidence, taken most favorably for the defendant, clearly shows that he is guilty of manslaughter, and we believe it to be our duty to affirm the judgment of the court, as there are no reversible errors found in the record. The last shot fired at the deceased by the defendant was undoubtedly fired while the deceased was down and helpless and in no condition to do anything that would either endanger the life of the defendant or put him in fear that he would receive any great bodily harm or further harm from the deceased.

Complaint is made of the admission of the dying declaration, to the effect that there was no proper foundation laid for admitting it as a dying declaration. The evidence shows clearly that the deceased was in a dying condition

when he made the declaration and that he knew he was going to die, or at least believed that death was near at hand and imminent. It was not necessary for any physician to be present to inform him of his condition and that he was certain to die, in order that he might make a dying declaration. It is sufficient in any case if the declaration relates to the facts of the injury of which the deceased afterwards died, and that it was made under the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance and without hope of escaping the impending danger. (*Starkey* v. *People,* 17 Ill. 17; *Collins* v. *People,* 194 id. 506.) There was no objection that any part of the dying declaration admitted in evidence was otherwise improper.

Complaint is also made of the ruling of the court in refusing to allow the witness Aulabaugh to state what was said to him by the other parties with him at the machine shed when the defendant and the deceased were talking. None of the persons in that party were near enough to hear what was being said by the defendant and the deceased. Some of them could not even see the participants in the conflict, as is already shown. They are therefore not bystanders in the sense of those words, so as to make their declaration a part of the *res gestæ.* The court committed no error in this holding.

Complaint is made of the giving of a number of the instructions on behalf of the People and for various reasons. We have examined all of the instructions given in behalf of the People as well as those given in behalf of the defendant, and none of them are subject to the objections urged to them by the defendant's counsel. The law of self-defense is clearly defined by the instructions given, and the defendant had the benefit of every phase of that defense that could possibly be applied to his case. The instructions stated all of the law of the case applicable to the facts and they were

properly applied to the facts of the case. Some of them are a little faulty in wording but none of them are substantially erroneous. The defendant was not prejudiced by any of the instructions complained of by his counsel.

One of the witnesses for the People testified concerning the defendant's general reputation as a peaceable and law-abiding citizen, etc., and testified to the effect that it was bad. Complaint is made of the ruling of the court in refusing to exclude the entire testimony of this witness because the witness in the course of his examination stated that he had "heard talk of his [the defendant's] violating the law; he didn't violate it in the last ten years." The witness' statement that he had heard talk of the defendant violating the law ten years or more before the trial ought to have been excluded for remoteness and for other reasons, but there was no specific request to exclude this specific evidence, and it was not error to refuse to exclude his entire evidence because of his testimony appearing in the above quotation,—at least not reversible error. Besides, the witness expressly stated that he did not base his testimony that the defendant's reputation was bad on the fact that he had heard of him violating the law ten years ago but upon other facts occurring since that time. There were about an equal number of witnesses testifying *pro* and *con* on the question of the defendant's general reputation as a peaceable and law-abiding citizen, and this evidence, taken as a whole, necessarily did not have any important bearing on the case and evidently had little to do with the making of the verdict of the jury.

For the reasons aforesaid the judgment of the court is affirmed.

*Judgment affirmed.*