(No. 20350.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE DANIEL GREENIG, Plaintiff in Error.

*Opinion filed December 18, 1930.*

HARTZELL, CAVANAGH & MARTIN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, HOMER H. WILLIAMS, State's Attorney, and CARL I. DIETZ, (CHARLES E. LAUDER, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

George D. Greenig was indicted at the October term, 1929, of the circuit court of Hancock county for the murder of Clarence Irvin on September 15, 1929. A trial was had during December of that year, and the jury found the defendant guilty of murder, fixed his punishment at imprisonment in the penitentiary for fourteen years and found his age to be sixty-nine years. Motions for a new trial and in arrest of judgment were denied and he was sentenced to confinement in the penitentiary at Joliet. He has sued out this writ of error for a review of the record.

The defendant lived about three and a half miles east of LaHarpe, in Hancock county, most of his life, and engaged chiefly in threshing, working in a saw-mill and tiling. He was over six feet in height and weighed about 145 pounds. Defendant, Thomas Moore, Dave Fife and Raymond Reed went in the latter's Ford car on Sunday evening, September 15, to Pontoosuc, in Hancock county. They arrived there between 7:00 and 8:00 o'clock and parked the car, headed east, near the house of Frank Moffat. A road extended east and west on the south side of the Moffat house. South of this road was the Pontoosuc station of the Santa Fe Railway Company. About a block east of Moffat's residence was another dwelling occupied by Hazel Sawdens, and a road extended north and south in front of and west of her house. There were no buildings in the block between the two dwellings except a small shed.

The deceased, Clarence Irvin, also known as "Tugg" Irvin, was a man forty-five years of age, was five feet seven inches in height and weighed about 140 pounds. He came to Pontoosuc Sunday evening, parked his car, facing south, in the road near the front of the Hazel Sawden dwelling, and went over to Moffat's house after the lamps were lighted.

Defendant testified that when he and the three men who were with him arrived at the Moffat house he went in first. Irvin was there at the time and stated what his name was. The other men came in the house and they all sat around and talked for three-quarters of an hour, though defendant did not hear all of the conversation because his hearing was poor. Before they left, Irvin asked defendant to play cards, but the latter refused. Defendant stated he and his three friends left the place and Irvin remained there. As soon as they reached the car, which was about two and a half rods from Moffat's house, Fife got in the back seat with defendant and sat on the left-hand side. Moore got in the front seat, and Reed, the driver of the car, went around in front to crank the car. As soon as defendant got in the car some man took hold of him, jerking at his shirt collar with one hand and choking him with the other. He did not know who the man was, as it was dark and his eyesight was not good. He said, "What have I done?" and, "Let loose; you are choking me." The man said, "That is all right," and, "I have got you." Defendant said, "Let go," but the man kept choking and pulling at defendant, who grabbed the door of the car to keep the man from getting him onto the ground. Then defendant said, "Let go or I will loosen you." The man did not let go and defendant loosened him. By "loosened" he meant he fired two shots and the man walked away in the dark. Defendant stated that he was scared—afraid of bodily injury and of being robbed; that he had $65 in the hip pocket of the underneath pair of overalls which he had on; that he had his gun in the back seat of the car, which he put there when

he started from Blandinsville; that he picked the gun up off the seat and shot twice right toward the man, who was on the foot-board of the car, on defendant's right. He stated he did not ask for help as he did not have time to do so. He said Moore got out of the car before the shots were fired, and that he did not know whether the boys knew how much money he had on him, as he had not exhibited the money to anybody but he had paid for the beer that they had at Moffat's. He stated he thought it was a hold-up but never reported it to anyone until at the time of the trial. He did not know where the man went after the shooting, but he and his three companions drove away in the car and went to Fort Madison, Iowa, and came back home through Pontoosuc about an hour and a half later.

Thomas Moore testified in behalf of defendant about being at Moffat's house, in Pontoosuc, on September 15, 1929, where he saw the deceased and where he heard defendant introduce him and his companions as some boys from Blandinsville. Witness stated that defendant, Reed, Fife and himself went out of the Moffat house together about 8:00 o'clock after having been there about an hour and went to the car, which was five or six rods east of the house; that Fife got in the front seat, witness and defendant got in the back seat and Reed did not get into the car immediately; that a man came around from the south and jumped on defendant and grabbed him; that he could not see what he was doing but it frightened him and he got out of the car. He thought it was a robbery or hold-up. He did not see a revolver in the back seat of the car and did not hear any conversation or see the shots fired. He went around in front of the car, where Reed was, and could not see what was going on in the back seat. There was a scuffling, and after the shots were fired he did not know what became of the man who was on the running-board. He further stated that nothing was said about what was done there after the four men left the scene of the shooting.

Raymond Reed was called by defendant and testified that he, defendant, Moore and Fife, the latter two of whom he had not previously known, went to Moffat's house, in Pontoosuc, on September 15 around 6:30 or 7:00 o'clock in the evening. Irvin was there when they arrived and Moffat and his wife were also there. The four men left Moffat's about 8:00 o'clock and started to the car, which was headed east and about ten feet or more from the Moffat house. Witness thought that Irvin came out of the Moffat house at the same time the other men did. The moon was shining to some extent and one could see a person some ten or fifteen feet away but could not distinguish his face. Witness stepped to one side of the car for a moment and heard a racket in the car. He looked over and saw a man on the running-board of the car, and he started to walk toward the car. Before he arrived there two shots were fired and a man stepped down from the running-board. Witness said, "What is the matter?" and the man said, "I guess I have got the wrong man." Witness then went around to crank the car and did not see the man any more. He testified that he did not know there was a gun in the back seat or that defendant had a gun; that none of the party, when they left the Moffat house, needed any help to walk, and that he did not hear defendant call for help during the hold-up and thought the occurrence was not reported to anyone.

Mary Moffat, the wife of Frank Moffat, who owned the house where defendant and his companions were just prior to the time of the shooting, testified that she heard defendant introduce Reed, Moore and Fife to deceased as "his friend, Mr. Tugg Irvin." She stated that when defendant and his three companions went out of the house together Irvin also left and was just a little way behind them. She stated that she had occasion to go to the kitchen door, which opened on the street running east from her house, and that she saw the men go east from her house.

Hazel Sawdens, who lived in a house about a block east from the Moffat house, had been away from home during a part of Sunday and returned to her house with Mrs. Crabtree about 8:30 or 9:00 o'clock that evening to shut up her chickens. She and Mrs. Crabtree testified on the trial, and the substance of their testimony was, that upon their arrival at the Sawdens house there was a car standing near the front of the house and facing south. As they left they saw something move back of the car—saw a man lying on the ground back in the weeds, about ten feet from the car. They did not know who it was but said that he was down and was trying to get up.

Louis Privia testified that on September 15, 1929, he lived in Pontoosuc, and that about 11:00 o'clock that night he found Irvin on his knees on the west side of the road, in front of the dwelling of Hazel Sawdens. There was a car parked just across the road from where he found Irvin. He obtained a drink for the injured man, placed him in a car and took him to the office of Dr. Coss, in Dallas City. Dr. Coss was acquainted with Irvin, who informed the doctor that he had been shot. Dr. Coss testified he found a bullet wound about an inch to the left and an inch and a half above the navel, and there was also a skin wound about an inch and a half long under the right arm. There were powder burns around the wound in the abdomen. The doctor gave the wounded man a hypodermic of morphine sulphate and atropine. Irvin was taken from the doctor's office to the hospital in Fort Madison, Iowa, where he was operated on about 1:30 A. M., September 16. He died the same morning about 8:30 o'clock from internal hemorrhage, caused from the bullet wound. The doctor testified that Irvin was in a comatose state and in very bad shape when he first saw him; that he told Irvin he was going to die, and Irvin said to him, "I am going to die; give me morphine enough to put me out of pain." Later, when the patient was taken to Fort Madison, he objected to having

his clothes taken off for the operation, and said, "I am going to die; let me be." The doctor stated that the patient was in a partial comatose condition, but that he could be roused like a man who was asleep and answer questions, and that then he would lapse off again into a comatose condition. He was of opinion that the giving of the morphine and atropine did not have any effect upon his mental condition; that the amount of morphine given would have some effect upon a person not in pain but to a person in pain it acted as an antidote. The doctor further testified that he asked the deceased when he was shot, and he said at first that he was shot at 7:30 and then said 9:30, and further said that George Greenig shot him. He was asked why Greenig shot him, and he replied, "Mr. Greenig and one of the boys were having a political discussion, and I said something he took offense and immediately shot me."

John Pryor, a deputy sheriff, testified on the trial that he went to the defendant's house, east of LaHarpe, about 9:00 o'clock on Monday morning, September 16, and placed him under arrest. Witness took him to two or three places before they arrived at the county seat about noon. While on the trip defendant told witness that he and his companions reached Moffat's house, in Pontoosuc, about 6:00 o'clock Sunday evening; that they had a few bottles of beer there; that Moffat and his wife and a man by the name of Irvin, from Fountain Green, were there, and they wanted to start a poker game. He stated to witness that there was no argument between Moffat and Fife, but there was an argument between them about him and Moffat's wife, and defendant suggested that they get out of there, and they left the place after having been there about two hours. They went to the car, and defendant, Fife and Moore got in the car, and somebody grabbed hold of defendant and began trying to pull him out of the car; that defendant told the man to get away; that the man began to choke him and the latter loosened him; that defendant

said the fellow stepped back and said, "I guess I got hold of the wrong man." Defendant said he knew it was against the law to carry a gun; that he always carried a gun in his car, and that his car was out of commission, so he put the gun in Reed's car when they left the house. He said the shooting took place out in the road alongside of Moffat's house, and thereafter they left there, went to Fort Madison and then came back home. After some further cross-examination of defendant, Pryor testified that he saw defendant in the sheriff's office after he (Pryor) had testified, and that defendant said to him, "You got everything pretty straight except where this happened;. it happened up where his car was at—at this other house; this fellow followed us up there." Marion Mosley also testified that he heard the same statement made in the sheriff's office by defendant to Pryor. Defendant, however, denied having made such a statement to Pryor.

There were fifteen or sixteen other witnesses residing in Hancock county, who were engaged in various kinds of business or vocations and who had known defendant from seven or eight years to thirty-five years, and all of them testified that his general reputation in the community for being a peaceable, quiet and law-abiding citizen was good.

The foregoing is all of the material testimony produced on the trial.

Complaint is made of certain instructions given at the request of the People. It is claimed that instruction 11 told the jury that the guilt of defendant had been shown by the evidence beyond a reasonable doubt and indicated such belief on the part of the court. The instruction might have been drawn so as to prevent such criticism, but it is only by a strained construction of the language used that one can interpret the meaning to be such as is advanced by the defendant. The jury could not have thought the court thereby expressed his view of the case, because they were expressly admonished in the first instruction given

that they were not to think the court had any opinion upon the facts of the case.

The fourth and fifth instructions are declared to be erroneous because they limited defendant's defense to the question as to whether or not it appeared to him, as a reasonable man, that he was in imminent peril of death or of great bodily harm, and entirely ignored his defense of justification for the killing because he believed he was about to be robbed. It appears that little confidence was placed in the evidence presented tending to show justification for the killing because of the fear of defendant being robbed. No instruction offered on behalf of defendant, whether given or refused by the court, stated to the jury that defendant would have been justified in killing deceased to prevent being robbed. Instructions 20, 21, 24, 25, 26 and 28 given at the request of defendant explained to the jury the law of self-defense as apparently relied on by defendant. In view of those instructions given, the fourth and fifth instructions could not have deprived defendant of any rights or prejudiced him before the jury.

Instruction 3 complained of set out certain things which the jury are entitled to consider in deciding whether or not the doctrine of apparent necessity in self-defense should apply to the facts presented in this case. The instruction did not define self-defense as set forth in the previous numbered instructions mentioned in this opinion as given in behalf of defendant, and those instructions, with instruction 25 given for defendant, fully informed the jury. We think there was no reversible error on account of the giving of instruction 3.

Instruction 6 is alleged to be erroneous because it singled out the testimony of defendant and applied different tests to his credibility and that of other witnesses. The wording and meaning of this instruction are practically the same as those in instruction 3 discussed and approved in *People* v. *Flanagan,* 338 Ill. 353.

There were thirty-one instructions given by the court—eleven for the People and twenty for defendant. Eleven instructions offered by defendant were refused. We have read and examined the instructions given, and as an entire series they sufficiently advised the jury of the cause they were called upon to determine and no error of any material consequence appears in them.

Defendant also contends that the court erred in permitting the court reporter to read from her notes to the jury the preliminary proof or testimony of Dr. Coss taken before the court and out of the presence of the jury, and upon which the court determined the admissibility of the dying declarations of Irvin. The question whether alleged dying declarations are made under such circumstances as to render them admissible in evidence is in the first place to be determined by the court upon a preliminary examination, and, the declarations being admitted in evidence, it is for the jury, upon consideration of the whole evidence, including that heard by the court upon the question of competency, to decide upon the credibility and weight of the declarations. (*Starkey* v. *People,* 17 Ill. 17; *North* v. *People,* 139 id. 81; *People* v. *White,* 251 id. 67.) Dr. Coss was present in court and gave his testimony before the jury relative to the dying declarations of Irvin and was cross-examined by counsel for defendant. The evidence given by him upon the preliminary examination before the court out of the presence of the jury, and upon which he was cross-examined by defendant's counsel, was presented to the jury in the same manner as heard by the court and counsel by the court reporter reading her short-hand notes of the doctor's testimony. This testimony of the court reporter was not competent but it was not prejudicial in this case.

It is further contended that the court erred in permitting one of counsel for the People to state to the court, in the presence of the jury, that there were three eye-witnesses to the shooting whom the People did not care to call, and

that there were reasons why counsel was not calling the three men, Fife; Moore and Reed. Counsel for defendant first stated he did not think it proper to make such a statement in the presence of the jury, and later stated, if there were reasons, the People should make their showing, and the court stated to counsel for the People, "You may state why." A further objection was interposed by defendant's counsel, and the attorney for the People said: "The State is unwilling to vouch for the stories of these three men, Dave Fife, Raymond Reed and Tom Moore, who were with the defendant, George Greenig, on the evening that the deceased, Clarence Irvin, met his death. We would ask the court to call them as court witnesses." The jury retired, the court refused to call the witnesses, and upon motion of defendant's counsel the court instructed the jury, upon their return to the court room, to disregard any statement made with reference to the three witnesses named. Almost an identical situation was presented in the case of *Carle* v. *People,* 200 Ill. 494, where it was held the witness was not discredited to any marked degree. The court stated in that case: "Where the State's attorney knows that a witness was present at the scene of the killing but for some reason, either because he has no confidence in the witness or for any other reason, he may doubt his veracity or integrity, he is not obliged to call such witness. In such case the court may call the witness and leave him open for cross-examination by either side. The State's attorney is invested with a certain discretion in the matter of calling witnesses for the State. Inasmuch as the court made it necessary for the State's attorney to announce the ground upon which he exercised his discretion, the statement that the People would not vouch for the testimony of the witness or guarantee its truth was not improper and was not a challenge of the truth or veracity of the witness."

It is lastly contended that the verdict of the jury is not supported by the evidence. It is not necessary to review

at length the testimony which was presented on the trial. It is, indeed, strange that defendant would be in fear of great bodily harm from the story told by him as to the activity of the man who he said attacked him. He was in the presence of three of his friends, all able-bodied men so far as the record shows, but when attacked he made no request for help, neither did he suggest any apparent fear of injury to himself. Without any outcry for help, and while still in the car, according to his own testimony he shot directly at the body of the man, who proved to be Tugg Irvin and made no investigation of the result. His fear of robbery or his belief that it was a hold-up must have been quite limited, as no one else, as shown by the record, knew he had $65 on his person. His statement that he thought it a hold-up was never made to anyone prior to the time of trial, and though he and his three companions passed through several towns that night after the shooting, neither of them reported to an officer or anyone else that there had been an attempted hold-up or a shooting in Pontoosuc. Evidently the jury were not impressed with the story of defendant or his companions as to the circumstances surrounding the shooting or at what exact location it occurred. It is the peculiar province of the jury to weigh and consider the evidence and judge from the appearance of the witnesses on the stand, their apparent honesty, intelligence and candor, or the want of it, the weight that should be given to their testimony. Where the evidence is conflicting this court will not substitute its judgment for that of the jury. *People* v. *Romano,* 337 Ill. 300; *People* v. *Hohimer,* 271 id. 515.

We are unable to say that the verdict of the jury was not warranted by the evidence, and the judgment of the circuit court is affirmed.

*Judgment affirmed.*