SUPREME COURT.    Erie General Term, November, 1851. *Taggart, Marvin* and *Hoyt*, Justices.

## THE PEOPLE *vs.* HIRAM KNICKERBOCKER.

Where, on a criminal trial, a person is drawn as a juror and challenged to the favor, and called as a witness in support of the challenge to prove a bias growing out of what he had heard or read on the subject, it is proper on his cross-examination, to ask him his opinion as to the character and extent of the supposed bias and whether he thinks it would influence him after hearing the evidence.

Where, on the trial of a challenge to the favor, improper evidence is received and the triors find the juror indifferent, and he is then challenged peremptorily, and it appears the prisoner had not exhausted all his peremptory challenges when the panel was completed, the prisoner can not afterwards avail himself of exceptions taken to the admission of such improper evidence before the triors.

To entitle the prosecution, on a trial for murder, to introduce evidence of the dying declarations of the deceased, it must appear by the preliminary evidence, that the declarant knew, or believed, his injury was mortal and that death was rapidly approaching. This may be shown by the expressions and conduct of the deceased, or by other satisfactory evidence.

After the introduction of the proper preliminary evidence, the prosecution is entitled to show such dying declarations, notwithstanding there may be other witnesses by whose testimony the same facts might be proved, which are sought to be established by such dying declarations.

At the Erie Oyer and Terminer held in June, 1851, Justice Parker presiding, Hiram Knickerbocker was tried upon an indictment for the murder of Karl Harkner and convicted. Exceptions were taken to decisions made upon the trial, which were brought before this court for review. The facts appear sufficiently in the opinion of the court.

*J. Verplanck*, for the prisoner.

*Ch. H. S. Williams* (district attorney), for the people

*By the Court*, MARVIN, J. — John Koch was called as a juror and was, by the prisoner, challenged *to the favor*. Triors were appointed and Koch was examined as a witness in

The People v. Knickerbocker.

support of the challenge. He stated that from what he had heard and read about the murder of Harkner, he had formed an opinion rather against the prisoner. On his cross-examination he stated: I have now no opinion of his guilt or innocence which would influence my mind after hearing the evidence. This was objected to on the ground that the conjectures or opinions of the witness as to the way he could act as a juror, upon the evidence, were improper. The objection was overruled and the prisoner excepted. The witness further stated, " I could take the evidence and find accordingly. The opinion I formed was based on the supposition that the newspaper account was true. I have no opinion whether it was true." The district attorney inquired, have you any opinion which it would require evidence to remove? This was objected to as calling for the opinion of .the witness. The objection was overruled and the prisoner excepted. The witness answered I think not. On being reexamined by the prisoner's counsel he stated, " I said and say that from what I read I thought the prisoner guilty; if the evidence should be as I read, I think him guilty. Question by the court — State whether you could try this man upon the evidence without bias? This question was objected to as calling for the opinion of the witness; the objection was overruled and the prisoner excepted; the witness answered, I think I could. The triors found the juror indifferent and he was then peremptorily challenged by the prisoner. The challenge was to the *favor*, and the issue before the triors was, whether the juror was indifferent between the people and the prisoner, and the question now is, was improper evidence admitted upon that issue? Could the witness under the circumstances give his opinion as to his ability to try the main issue upon the evidence without bias?

In *Lohman v. The People* (1 *Com. R.* 384), Judge Gardiner, in delivering the opinion of the court of appeals, says, " Upon an issue of this kind from the nature of the facts to be established, the opinion of the juror derived from his own consciousness, was relevant, competent and primary evidence." He says, in that case, the effect of the evidence was, " to elicit an

opinion as to the strength of the impression to which he had previously testified, and whether he was conscious of the ability to render a verdict according to the evidence, notwithstanding. If the juror answered in the affirmative, it would have been a declaration that he possessed such ability. This would be but an opinion, but one founded upon his own consciousness, and so far entitled to the consideration of the triors, although by no means conclusive upon them." He adds, "The question then was equivalent to asking the juror, whether he felt or was conscious that he could render an impartial verdict, notwithstanding all he had heard or read." The decision in *Lohman's case* seems to be an authority in point in the present case.

There is also another answer to these exceptions. After the triors had found the juror indifferent, the prisoner challenged him peremptorily. He did not sit as one of the jurors upon the trial of the main issue. The prisoner had not exhausted his peremptory challenges when the panel was completed. He can not now avail himself of the exceptions taken to decisions upon the trial of the collateral issue raised upon the challenge. (*Freeman* v. *The People,* 4 *Denio,* 31; *People* v. *Bodine,* 1 *Denio,* 300.)

The people proved that Harkner died, on the 23d day of January about 8 o'clock in the morning, and they gave evidence tending to show that he died from the effect of a pistol shot; and that the prisoner and one Hall were together at the place where Harkner received the wound on the evening of Tuesday, the 21st January, and that the prisoner then had on a light colored coat and Hall a dark one; and that the prisoner had, on the same evening, stolen a watch from Harkner; also that the man with the dark coat, had a pistol in his hand and put it in his pocket immediately after the report of the pistol by the discharge of which Harkner was wounded. Harkner was taken home covered with blood and apparently dead. On being placed upon a bed, he made signs and talked in a whisper. He said, one arm and one leg were much like death, and he would rather die than remain in pain. His wife told him she hoped he would not leave her, and he told her she had

a child and she should console herself with that. He did not say directly that he thought he should die. The attending surgeon testified that Harkner was very weak and could only speak a little at a time, that he was paralyzed on one side, that he could faintly answer on Wednesday night, that he endeavored to console him, but he would not be consoled, but said he would die, but did not say when. He said he could not get well, he must die.

The people offered in evidence the declarations of Harkner made the evening before his death, as to the person who killed him. The prisoner's counsel objected, the objection was overruled and an exception taken. The witness testified that he said to Harkner the evening before his death, " I guess you will get over it again;" Harkner replied, " I never can get over it, I can't live." On being asked who shot him, who hurt him, he said the man who stole his watch; that the man with the white coat on shot him, and the man with the dark coat on stabbed him. About 12 o'clock the same night, in answer to a question, put by his wife, he spoke about dying. The objection to the declarations of deceased, was, that it did not appear, his statements were made under the belief or impression of immediate dissolution, or under the belief that he would die.

After a careful examination of this case as disclosed in the bill of exceptions, I am of the opinion that the evidence as to the dying declaration of Harkner was properly admitted. The principle upon which this evidence is received in trials for *homicide*, as stated by Eyre, C. B., is, that the declarations were made in extremity, when the party is at the point of death and when every hope of this world is gone, when every motive of falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth. A situation so solemn and so awful is considered, by the law, as creating an obligation equal to that which is imposed by an oath administered in court. (*Roscoes's Cr. Ev.* 7.)

The rule has been applied in a great variety of cases, presenting different circumstances. When the preliminary evi-

dence has not been satisfactory to show that the declarant knew or believed that his injury was mortal and that death was rapidly approaching, the evidence of the declarations has been rejected; or when from the evidence it appeared that the party entertained hopes of recovery, or it was left doubtful whether he did not entertain such hopes, the evidence has been rejected. If we test the present case by any of the rules that have been established, the evidence was properly admitted. The declarations were certainly made in extremity, and when the declarant was at the point of death. But they are only admissible when the party making them, knows or thinks he is in a dying state. Positive evidence, however, of that knowledge or belief, is not required. It may be inferred from the general conduct or deportment of the party, nor is it necessary to prove expressions of apprehension of *immediate* danger, if it be clear that the party does not expect to survive the injury. (*Ros. Cr. Ev.* 29, 30, *and cases there cited.*)

If we consider Harkner's real condition, we find nothing in it upon which to build a hope; his conduct and declarations furnish no evidence that he entertained any hope of recovery; on the contrary, they furnish very strong evidence that he did not believe or entertain any hope that his recovery was possible. He appears to have been fully conscious of the extremity to which he was brought, and that he must die and could not recover. (2 *Russ. on Crimes,* 682 to 687, *and cases cited.*) The evidence shows, I think, that all hope of this world was gone He rejected consolation, and consoled his wife.

It was said upon the argument, that the rule admitting dying declarations, is founded in *necessity*, and that when other evidence of the facts to which the declarations state, can be, or is given, the *necessity* does not exist, and that therefore the declarations should not be received.

It appears, in the present case, that it was proved on the part of the people, that the man with the *dark coat* had a pistol in his hand and put it in his pocket immediately after the report of the pistol wounding Harkner. This is the entire statement of this evidence in the bill of exceptions. The declarations of

Harkner related to the shooting and stabbing, and he designated the man in the light colored coat (the prisoner), as the man who shot him. It is argued that as the people gave evidence in relation to the shooting, the declarations of Harkner should not have been received. Roscoe, in his Criminal Evidence, says: " Evidence of dying declarations has been considered, by some, to be admissible, from necessity, since it often happens that there is no third person present to be an eye witness to the fact and the usual witness in other felonies, viz., the party injured, is got rid of. The rule, in its origin, may have been adopted from necessity, but it is now well established and rests upon principle, which do not exclude the declarations, although the fact declared may be susceptible of proof from other evidence."

The dying declarations are received *as evidence in the cause,* and if there are living witnesses who can give evidence touching the same facts, they may be called and examined, and the whole evidence may be submitted to the jury. We have not been referred to any case where this question has been raised. In this case the facts, as stated by Harkner, had not been proved. His statement was that the man in the *light coat* shot him, and the man in the *dark coat* stabbed him. The witness, who had been examined, stated that the man in the dark coat had a pistol immediately after the report. It does not appear from the evidence, whether the prisoner had a pistol or not, or which of the two persons shot. The evidence proved a circumstance from which an inference might be drawn, that the man in the dark coat discharged the pistol. Harkner said it was the man in the light coat that shot him, and all this evidence was proper for the jury.

The objection to the evidence of the dying declarations was not put, at the trial, upon the ground that living witnesses had spoken or could speak to the facts, to which the declarations related, but upon the ground that it did not appear that the statements were made under the belief or impression of immediate dissolution, or under the belief that the declarant would die.

I have, however, briefly considered the objection now taken, and in my opinion it is not well founded. No error was committed upon the trial, and a new trial should be denied.

New trial denied.

---

SUPREME COURT. Albany General Term, December, 1851.
*Harris, Parker* and *Wright,* Justices.