WALLACE *v.* THE STATE.

1. It is not error for the presiding judge to make no reply to a communication in writing sent to him by a jury engaged in deliberating on their verdict, inquiring whether or not it would be legal . for them to return a verdict for voluntary manslaughter. Nor is it error afterwards to have the jury brought into court and then to recharge them by repeating the original charge and adding thereto appropriate instructions as to the law of voluntary man-

slaughter. Although there may be no basis in the letter of the evidence for a charge on the subject of voluntary manslaughter, yet if in view of the suddenness of the rencounter and of conflict amongst the witnesses the homicide could by any possible just inference from the evidence have been in truth and in fact neither murder nor justifiable, but voluntary manslaughter, the giving in charge of that grade of manslaughter is not reversible error, although the court may not have been bound so to charge.

2. It was not error to admit evidence of dying declarations on the preliminary showing made in this case, nor was it to the prejudice of the accused to instruct the jury that the evidence would not be for their consideration if they believed the declarations were made at a time when the declarant was not in the article of death, or *in extremis,* or at a time when he had hope or expectation of living.

3. A part of the newly discovered evidence being a threat to take the life of the accused made by the deceased immediately before the fatal rencounter, and a part being a somewhat ambiguous declaration of the deceased made whilst he was in a dying condition from the effects of the mortal wound, and the decided weight of the evidence which was before the jury being against the verdict for voluntary manslaughter, the case fairly considered being one of murder or justifiable homicide, the court erred in not granting a new trial.          *Judgment reversed.*

August 1, 1892.

Criminal law. Murder. Manslaughter. Charge of court. Evidence. Before Judge BOYNTON. Muscogee superior court. May term, 1891.

Will Wallace was indicted for the murder of Frank Huckaby, and was found guilty of voluntary manslaughter. He excepted to the overruling of his motion for a new trial, which motion contains the following besides the general grounds:

1. The jury, having retired and having been out all day, sent a written communication to the presiding judge, in which they inquired whether they could find the prisoner guilty of voluntary manslaughter, to which inquiry the judge did not reply nor instruct the jury that they could only find the defendant guilty under his charge theretofore given. Defendant insists that such refusal tended to his injury, because the jury evidently

desired to find him guilty of voluntary manslaughter when the same was not authorized by the charge of the court, thereby getting said offence fixed in their own mind to the prejudice of defendant. And after the jury had been out a day and night, the judge recalled them and asked them if they had agreed on a verdict or were likely to agree, and when they replied they had not agreed and were not likely to agree, then asked them whether their disagreement arose from a question of law or fact, and they replied that it arose from a question of fact; whereupon the court recharged them, over the objection of defendant's counsel. This recharge sets forth the law of voluntary manslaughter, and contains the following instruction which is assigned as error: "If you believe from the evidence, gentlemen of the jury, that Frank Huckaby made an assault upon Mr. Wallace, or made an effort to do him a violent injury, and it was done in such a sudden manner and upon such a sudden act as to arouse the passions of Will Wallace and provoke him to action, and if you believe that he did act and did take the life of Frank Huckaby under the circumstances, and that it was done without any mixture of deliberation whatever, and under a sudden heat of passion, then you would be authorized to find him guilty of voluntary manslaughter."

2. The motion further complains that the court erred in permitting the State to prove, over defendant's objection, the dying declarations of Huckaby, by Will Smith. Defendant insisted that said dying declarations ought not to be admitted, because the proper foundation had not been laid for their admission, the evidence failing to show that at the time of the alleged conversation Huckaby was conscious of the fact that he was in a dying condition. The evidence of Smith was, in substance: I stayed with Frank Huckaby from the time he was shot until about five minutes before his death. I

think he knew his condition. I say he realized his condition. I know that he realized his condition by his talk; he told me from time to time that he could not get well. He called to me about one or two o'clock at night and said, " Willie, have they caught those parties?" He did not say what parties. I said, " They have got Mr. Wallace and carried him to jail "; and he said, " Uh huh." I said, " Frank, what caused this difficulty ?" and he mentioned something about a job at the railroad; a dispute got up between him and Narramore about a job at the railroad, but he never did finish it or explain it, and I do not know what he meant by that. I asked him if he cut either one of the parties, and he said, " I do not know whether I did or not, but I tried." He said, " When I entered the porch of the house Coon Narramore knocked me over the head with a chair" (the skin was knocked off his forehead), "and I got on my hands and knees, and as I raised he hit me again across the head, and the chair broke. When the chair broke I clinched him and cut him with all my might, and while we were clinched in the sitting-room I heard the report of a pistol twice, and I turned sick, and from that I realized that I was shot, and I whirled to see who it was shooting and I saw it was Will Wallace, and I never touched Will Wallace; if I did I do not remember it; and when I whirled he shot me again here, and I turned and made my way out of the house." He did not tell me anything about his condition at that time. I told him he ought not to get out of heart, that he was a very stout man. He rested a little while after this talk and said, " I will never get well." I told him he ought not to get out of heart, " You are a big, stout man; you have a heap of flesh, and probably these wounds are only flesh wounds," but he said, " This wound back here hurts me so badly." He told me on Saturday night and Sunday morning that he could not get well, and he

told me again on Monday when I helped dress him. I found a ball in the bed; he asked me what that was, and I told him it was a ball, and to encourage him said I thought it was the last ball and he ought to be in good heart for he had found the last ball; and he shook his head and said, "It is too late." To the best of my knowledge he was a dying man at that time. He seemed to realize it when he was talking to me. The first conversation I had with him, when he told me how it occurred, was somewhere between midnight and Sunday morning. Afterwards I tried to encourage him and impress him with the fact that he would not die, but he said in reply that he could not stand it, that he was suffering so much pain he could not stand it. He also told me on Sunday that he could not get well, and on Monday he said he could never get well. He lived until about eight o'clock Tuesday night.—There was also evidence that Huckaby told another witness, who saw him on Saturday and Sunday, that he did not think he could get well, that he knew from his feeling, he could hardly get his breath, that he felt very badly; and when the witness told him may be he was not hurt as bad as he thought, he shook his head and told the witness he wanted to talk with him, but his breath was so short he could not, and he rested a little and then said he did not think he would ever get well, that he would never get over it, that he felt so badly and could hardly breathe. It further appeared that Huckaby was wounded three times, once in the left breast, once in the right side above the liver, and once just above the hip. The physician who was called to see him found his condition very bad; he was suffering a great deal and had been bleeding some internally, but seemed to be perfectly rational. This was a half hour after he was shot.

Error is assigned on the following charge of the court: "If you believe from the testimony that he made a state-

ment, and that it was made at a time when he was not in the article of death or *in extremis*, or made at a time when he had hope of living or an expectation to live, then it would not be evidence for your consideration and you would be authorized to disregard it."

3. The remaining grounds of the motion are newly discovered evidence. The affidavit of Miles Greene was to the following effect: On the evening of the difficulty deponent was sitting in front of a store near the house of Mrs. Young where the shooting occurred. He saw Huckaby pass by Wallace who was standing on the sidewalk, and brush up against him. Wallace, who was on crutches, came very near falling. Some words passed between Wallace and Huckaby, which affiant did not understand. He saw them shake hands. Wallace then went into Mrs. Young's house, and in a short while Huckaby passed by affiant, who was still in front of the store, and went below the store. Huckaby then turned, passed the store, went to Mrs. Young's house and knocked on the door, which was opened by Coon Narramore who had been on the street with Wallace. When Huckaby said, " I want to see that damn rascal called Wallace," Narramore replied, " Go and get sober and then come and see Wallace." Mrs. Young came to the door about this time, and came out on the porch and pushed Huckaby to the steps. Narramore was standing in the door when Huckaby dodged around Mrs. Young and rushed to the door and went in the house. Immediately after this deponent heard the report of a pistol fired several times. When Mrs. Young came on the porch she called for some one to come and take Huckaby home. Narramore either struck or shoved back Huckaby before he entered the house, but deponent could not tell which. In a short while after the shooting was over, deponent saw Beall Weeks come across the railroad track which was about fifty feet from Mrs. Young's, and

walk down the sidewalk to Mrs. Young's and go into the porch. While the shooting was going on Weeks was not in front of Mrs. Young's house and did not see the difficulty, because he got there after the shooting was over. Soon after Weeks got to Mrs. Young's, Huckaby came out and went home. Deponent saw the policemen; one of them got there soon after Weeks. From the point where deponent was, though only a short distance from the front door of Mrs. Young's, it was impossible for him to see what was going on inside of the house. At the time of the shooting no one was on the sidewalk immediately near Mrs. Young's, except affiant and a negro who was unknown to affiant. Affiant did not tell either Wallace or his attorney or his friends what he knew about this difficulty until after Wallace's case was tried, and so far as affiant knows no one knew of this until he told it. As to this affidavit it is proper to state that a portion thereof tended to confirm some of the evidence for the defendant and some of his statement, and a portion to controvert the testimony of Beall Weeks, who was one of the principal witnesses for the State, and who testified, among other things, that he saw Huckaby start into the house and saw Narramore knock Huckaby down on the front steps with a chair; that Narramore turned back and got inside of the door, and Narramore and Huckaby clinched and had "a right smart little scrimmage there," and Weeks saw Will Wallace shoot twice while Narramore and Huckaby were clinched, which seemed to separate them, and Huckaby "turned sorter to his right" and Wallace shot twice more, was witness's recollection.

The affidavit of Callie Temple was to the effect, that on the evening of the shooting affiant saw Huckaby at Mrs. Cotton's store, and heard Huckaby say that he was going to kill that man to-night or he would get killed himself; that this was immediately before the shooting

and could have been only five or six minutes before the shooting was done.

The affidavit of J. W. Howard was to the effect, that on Monday or Tuesday before the death of Frank Huckaby on Wednesday, he had a conversation with Huckaby, and in the conversation said to Huckaby that he could not get forgiveness unless he forgave every one, to which Huckaby replied, "I have done that"; that affiant then said to him, "Have you forgiven Wallace"? to which Huckaby replied, "Yes, I do not blame him for what he did"; and that Huckaby further said that at the time of the difficulty he was drunk.

J. H. WORRILL, for plaintiff in error.

A. A. CARSON, solicitor-general, and THORNTON & McMICHAEL, contra.