The State of Iowa, Appellee, v. Albert G. Phillips and
Lewis Brooks, Appellants.

**Murder in First Degree: ALLEGATION OF.** An indictment which
1   charges murder generally, sufficiently designates the crime, as
the degree of the crime is to be gathered from the facts as
alleged.

**Murder in First Degree Defined: SUFFICIENCY OF INDICTMENT.**
2   Murder in the first degree is the willful, deliberate and pre-
meditated killing of a human being with malice aforethought,
and the allegations of the indictment conform to this rule.

**Same: DUPLICITY IN INDICTMENT.** An indictment which describes
3   but one mortal wound and alleges that deceased died "of said
mortal wounds" is not bad for duplicity.

**Evidence: ADMISSIBLE AS RES GESTAE.** The facts relating to the
4   attempt of defendants to escape arrest, the pursuit of the posse,
their surrender, and the weapons and other articles found on
the person of defendants at the time of arrest, are admissible as
part of the *res gestae*.

**Evidence: IDENTIFICATION OF EXHIBIT.** Where a bottle was taken
5   from the defendants at the time of the arrest, of the same
general description as one introduced on the trial, and it is
shown that the same was in the possession of one not a wit-
ness, there was not sufficient indentification of the bottle and
contents and it was error to admit it or allow a witness to state
its contents.

**Evidence; IMPEACHMENT OF WITNESS: MINUTES OF EVIDENCE BEFORE
6   GRAND JURY.** The minutes of the testimony of a witness be-
fore the grand jury are admissible on the trial for the purpose
of impeachment, but where the precise proposition on which
it is proposed to discredit the witness is not disclosed, an
exclusion of such minutes by the court is not error.

**Evidence: ADMISSIONS.** Where defendants are being jointly tried,
7   evidence of admissions or statements made by defendants after
arrest regarding the crime are admissible against either under
proper instructions.

**Dying Declarations: ADMISSIBILITY OF: EVIDENCE.** Dying declar-
8   ations are only admitted in evidence where the injured person

is actually dying or suffering from a mortal wound and is fully conscious that death must soon follow. Evidence considered and held not to come within the rule.

Same: INSTRUCTION REGARDING. It is for the court to determine 9 the admissibility of evidence of dying declarations and for the jury to consider and give such weight as all the facts and circumstances justify, and the court should explicitly instruct the jury in relation thereto.

Reasonable Doubt: INSTRUCTION REGARDING. In an instruction 10 defining "a reasonable doubt", the words "to justify an acquittal" criticised, but when taken in connection with the entire paragraph, held not prejudicial.

Murder: INTENT: PREMEDITATION: INSTRUCTION. An instruction 11 that aiming and firing a gun with fatal effect is of itself evidence of an intent to kill, and "therefore of a willful, deliberate and premeditated killing" is erroneous, as proof of intent alone does not establish premeditation, or murder in the first degree.

Premeditation: JURY QUESTION. Premeditation and deliberation 12 in the commission of the crime of murder are questions of fact for the jury, and are not to be inferred as a matter of law, from a wrongful intent, and an instruction not in accordance with this rule is erroneous.

Same: AIDING AND ABETTING: INSTRUCTION. An instruction that 13 "if one of the defendants was guilty of the act of shooting which caused the death of deceased, still if you find the other defendant was present aiding and abetting and encouraging and assisting in the commission of the crime, then both defendants would be equally guilty of the crime charged", is erroneous, as the one aiding and assisting may not have participated in the intent and premeditation.

Arrest Without Warrant: WHEN LAWFUL. Under Code, section 5196, 14 an officer may make an arrest without a warrant when a public offense has been committed, and under section 5197 a private citizen may make an arrest when a felony has been committed, where there is reasonable ground for believing the person to be arrested committed the offense, and where a crime has been committed and the guilty person arrested in a proper manner, the arrest is lawful, though the officer without a warrant and the private citizen always act at their own peril.

Arrest: THREATENED VIOLENCE: RIGHT OF ACCUSED TO RESIST. It is 15 the duty of one making an arrest to inform the person to be

arrested of the intention to arrest him, the cause thereof, and
to require him to submit to custody under Code section 5199,
and where there is a failure to impart this information and
the officer and his posse present loaded guns, in a threatening
manner, so that the accused has reasonable grounds to fear
bodily injury, he has the right to resist proportionate to the
threatened violence, and if an affray ensues and an officer is
killed by the accused he is not guilty of murder in the first
degree.

Arrest: RESISTANCE: INSTRUCTION.    An instruction that if the
officer, on reasonable information and belief of guilt, sum-
moned a posse and armed with guns and revolvers went to
arrest the accused and in the presence of the posse called on
the accused to throw up their hands and informed them that
he wanted them, then resistance was unlawful, and if, in mak-
ing resistance deceased was killed, the defendants are guilty
as charged, is erroneous, unless followed by an instruction
that the jury should also find that defendants knew, or as rea-
sonable men should have known, that their arrest was sought
by lawful authority and they were not in danger of personal
violence.

*Appeal from Buena Vista District Court.*—HON. A. D.
BAILIE, Judge.

SATURDAY, DECEMBER 20, 1902.

INDICTMENT for murder.   Verdict of guilty, with death
penalty, and from judgment entered thereon defendants
appeal.—REVERSED.

*F. F. Faville* for appellant Phillips.   *F. H. Chap-
man* for appellant Brooks.

*C. W. Mullan* Attorney General, *C. A. Van Vleck*,
Assistant Attorney General, *H. F. Schultz*, County At-
torney, and *F. H. Helsell*, for the State.

WEAVER, J.—Albert City is an incorporated town
situated in the eastern part of Buena Vista county, Iowa.
Between two and three o'clock in the afternoon of the
16th day of November, 1901, one Gillium, a druggist

doing business in said town, received a message by telephone from some person whose identity is not disclosed in the record, but supposed to have been speaking from the town of Sioux Rapids, to the effect that on the night previous a bank at the town of Greenville, in Clay county, had been burglarized, and that three persons suspected to have been connected with that offense had been seen moving in the direction of Albert City. Gillium soon met one Lodine, a drayman, who was also marshal of the town, gave him the substance of the message he claimed to have received, and told him to look out for and arrest the three men, describing them as two white men and a mulatto, or two white men and a negro; the exact phrase employed being in some doubt. Later in the afternoon Lodine reported to Gillium the presence of three men, whom he believed to be the persons wanted, in the waiting room of the railroad station a block or two distant. Gillium thereupon made an errand to the station, saw the men, and, coming back to his store, told Lodine he believed them to be the parties whose arrest was desired. A party was then organized to effect the capture, consisting of Lodine, Gillium, John Sundblad, M. H. Conlin, A. Gulbranson, Dr. Knee, Mr. Shob, and others. Lodine was armed with a repeating rifle, Sundblad with a repeating shotgun, and Gillium and Gulbranson with revolvers. Whether others carried weapons, and, if so, the character of them is not clear. Proceeding to the station, the marshal and his party crowded through the door of the waiting room in a body as nearly as possible, with weapons in hand ready for instant use. As they entered they advanced in the direction of the suspected men,—being the appellants, and one Dolan, who was killed later in the fray,—the marshal calling out, "Hands up! Hands up!" Some of the witnesses also say he added to this command the words, "We want you." Defendants and Dolan immediately drew revolvers, and numerous shots were exchanged, though the testimony

tends to show that one of the defendants or Dolan was first to discharge his weapon. The marshal and his party soon retreated, taking up various positions where they could command the door and windows of the waiting room, Sundblad running across the railroad track and taking his stand behind a freight car. From these positions shots were fired into the waiting room, and at intervals defendants and Dolan came to the door and fired at the posse. One of the shots so fired it is alleged inflicted upon Sundblad a wound of which he died a day or two later. Finally the besieged party emerged from the station, and sought to escape into the country. In this movement Dolan received a fatal shot from one of the posse. The defendants continued the retreat, closely followed by their pursuers, and after a running fight of several miles were captured. The indictment in this case was returned November 22, 1901, and the trial was had five days later.

I. Appellants contend that the indictment was insufficient for the reason that (1) it does not designate or charge in specific words the crime of murder in the first degree; (2) it does not allege facts constituting murder in the first degree; (3) it is bad for duplicity.

1. MURDER: in first degree: allegation of.

We do not think that the statute requires that an indictment for murder shall name in so many words the degree of the crime charged. Code, section 5281, designates the form of indictment which must be substantially followed in all cases, and provides that at the proper place the name of the offense, if it have any, shall be inserted. This, we think, is fully observed in the indictment before us, which accuses the defendants "of the crime of murder." There is, under our law, but one crime called murder. The so-called degrees of this offense do not constitute distinct crimes, but gradations of the same crime, devised for the purpose of permitting punishment to be varied according to the circumstances of greater or less enormity charac-

terizing the criminal act. When, therefore, the indictment formally charges the defendants with the crime of murder generally, the requirements of the statute in this respect are met, and we must look to the facts set forth in the body of the instrument to ascertain the degree of the crime for which the accused may lawfully be placed upon trial. *State v. Jones*, 1 Houst. Cr. Cas. 21; 21 Am. & Eng. Enc. Law, 156.

The objection that the indictment does not state facts constituting murder in the first degree is not well taken. After stating the name and date of the offense, the alle-

-2.  MURDER: in first degree defined; sufficiency of indictment.

gation is that the defendant, in and upon the body of one John Sundblad, "willfully, feloniously, deliberately, premeditatedly, and with malice aforethought did commit an assault with deadly weapons, being revolvers then and there held in the hands of the said Albert G. Phillips and Lewis Brooks, and loaded and charged with loaded cartridges, and then and there the said Albert G. Phillips and Lewis Brooks did, with the specific intent to kill and murder the said John Sundblad, willfully, feloniously, deliberately, premeditatedly, and with malice aforethought shoot off and discharge the contents of said deadly weapons at, against, and into the body of the said John Sundblad, thereby wrongfully, feloniously, deliberately, premeditatedly, and with malice aforethought inflicting upon the body of the said John Sundblad a mortal wound, of which said mortal wounds the said John Sundblad  *  *  *  died."

The point made is that, while charging the defendants with having inflicted a mortal wound willfully, feloniously, deliberately, and premeditatedly, it does not charge that the murder was so committed. But, except for the obscurity arising from the formal and technical mode of expression made use of in the indictment, it would be difficult to charge murder in the first degree in apter language than is here employed. Murder in the

first degree is the willful, deliberate, and premeditated killing of a human being with malice aforethought. Each of the elements of this definition is contained in the charge made against the defendants, both as to the assault and to the infliction of the mortal wounds.

It is also charged that the wounds were inflicted by defendants with the specific intent to kill, and if the wound was inflicted with intent to kill, and death resulted from it, the killing was willful; and if, as charged, it was inflicted deliberately, premeditatedly, with such intent and with malice, then the killing was also deliberate and premeditated. *State v. Shelton*, 64 Iowa, 337. There was no error, therefore, in the holding of the district court that the indictment charged the crime of murder in the first degree.

The further objection, that the indictment is bad for duplicity, is without merit. It is true that in charging the assault but one mortal wound is described, and it 3. SAME: duplicity in indictment. is also true that Sundblad is thereafter alleged to have died "of said mortal wounds," using the word in the plural instead of the singular form. This change in the form of the word is plainly a mere slip of the pen. The expression "said mortal wounds" is to be referred to the wound which had thereinbefore been specifically described. No other interpretation can be fairly placed upon it.

II. Evidence was admitted tending to show that after the wounding of Sundblad the defendants undertook to escape, and were closely followed and captured, as noted 4. EVIDENCE: admissible as res gestae. in the statement of the case. The state's witnesses were permitted to describe the incidents of this pursuit, including the interchange of shots between the parties, the seizure of one or more teams by defendants to aid them in their flight, and their final surrender. The admission of this testimony is assigned as error. The exciting episode in which Sundblad lost his

life, beginning with the advance of the posse upon the
defendants in the railway station and ending with the sur-
render of the latter several miles distant, was all one tran-
saction, or perhaps more accurately stated, one unbroken
series of transactions, so closely connected and related
that they were clearly admissible as a part of the *res
gestœ.* The same may also be said with even stronger
reason as to the evidence concerning the killing of Dolan
and wounding of Lodine in the melee at or near the rail-
road station, which was admitted over defendant's ob-
jection. Nor do we think there was any error in permit-
ting witnesses to testify as to the money, weapons, and
other articles found on the persons of the defendants at
the time of their arrest. The justification for the attempt
to make the arrest was the belief or suspicion that these
men had been engaged in a recent bank robbery, and
anything tending to disclose their connection with that
offense was material to the inquiry.

III.   A much more serious objection is raised to the
use in testimony of a bottle supposed to contain nitro-
glycerine, and said to have been found on the person of
5. EVIDENCE: one of the defendants. It was shown that
identifica-
tion of ex-   among the articles so found was a bottle of
hibit.   this general description. On the trial a bot-
tle was produced in the presence of the jury by the state
as the one thus obtained, and Gillium was permitted to
testify that he thought or believed it to contain nitroglyc-
erine. Objection was made that there was no sufficient
showing of the identity of the exhibit. This objection
was overruled. It should have been sustained. It is
shown without dispute, so far as we can find in the rec-
ord, that after the bottle had been taken from the defend-
ants it went into the possession of one England, who kept
it for a period not definitely shown. England was not a
witness on the trial, and there is an entire absence of
testimony as to the manner in which the exhibit and its

contents were kept or preserved in his hands. Under such a condition of the proof, the overruling of the objection was error to defendants' prejudice.

IV. The witness Gillium testified, among other things, that the telephone message received by him and communicated to Lodine described the men whose arrest was desired as "two white men, and a mulatto." Upon cross-examination he identified the minutes of his testimony before the grand jury, and admitted that they had been read over to and signed by him. Thereafter defendants offered these minutes in evidence as tending to impeach Gillium, but the offer was upon the state's objection refused. This evidence might well have been admitted, but we are not disposed to hold its exclusion reversible error. The point sought to be made by the defendants was that the witness when before the grand jury had said that one of the men was described as a "negro." This, however, was not brought to the attention of the court when the offer was made. Counsel's offer was of the minutes as a whole, without disclosing the precise proposition upon which it was desired to discredit the witness. To say the least, we think it was within the discretion of the court to require counsel to call attention to the specific fact relied upon, and give the witness a fair opportunity to explain, if he could, any real or apparent inconsistency in his statements. The objection made by the state as to the competency of the minutes as evidence was not well taken. The cases relied upon in support of it were decided under a statute unlike the one now in force (Code, section 5258), and under circumstances unlike those in the case at bar. When a witness is shown to have voluntarily signed a written statement, the contents of which were fully disclosed to him, we see no reason, in the statute or in the ordinary

*6. IMPEACHMENT of witness: minutes of evidence before grand jury.*

principles of the law of evidence, why it is not always competent for the purposes of his impeachment when the proper foundation has been laid.

V.    The state was permitted to show conversations had with the defendants in jail after their arrest, and statements by them upon such occasion, bearing upon the

7. EVIDENCE: admissions.

alleged robbery of the bank as well as the conflict preceding their capture.    We have no doubt of the admissibility of this evidence.    It is true that statements or admissions made by one of defendants under such circumstances, even in the presence of the others, are not ordinarily to be considered as evidence against his co-defendants (*State v. Weaver*, 57 Iowa, 730); but these defendants were being tried jointly, and neither could exclude testimony which was pertinent against himself simply because it might not be entitled to any consideration against his co-defendant.    Everything was admissible which was competent against either under proper instructions to the jury as to its application.    Moreover, most, if not all, of the conversations related seem to have been directly participated in by both defendants in such manner that they may fairly be considered admissible against either.

VI.    The wife of Sundblad was permitted to testify to a statement by her husband that "the nigger shot him." This language is assumed to have reference to Phillips,

8: DYING declarations: admissibilty of: evidence.

who is a mulatto, and its competency is sought to be sustained as a dying declaration.    It is a universally recognized rule that, to render declarations of this nature admissible in evidence, it must be shown that the injured person was actually dying, or was suffering from mortal injury, and that he was fully conscious of such fact, and that the words were spoken under solemn conviction of impending dissolution.    *State v. Elliott*, 45 Iowa, 486; *State v. Baldwin*, 79 Iowa, 719; *State v. Nash*, 7 Iowa, 347; *Kelly v. U. S.*, 27 Fed. Rep.

616; *Tracy v. People*, 97 Ill. 101; *Morgan v. State*, 31 Ind. 193; *Watson v. State*, 63 Ind. 548; *People v. Knickerbocker*, 1 Parker, Cr. R. 302; *Smith v. State*, 28 Tenn. 9; *Robbins v. State*, 8 Ohio St. 131; *State v. Furney*, 41 Kan. 115 (21 Pac. Rep. 213, 13 Am. St. Rep. 262); *People v. Kraft*, 91 Hun, 474 (36 N. Y. Supp. 1034); *Westbrook v. People*, 126 Ill. 81 (18 N. E. Rep. 305); *North v. People*, 139 Ill. 81 (28 N. E. Rep. 966).

The evidence relied upon by the state to establish the competency of Sundblad's declarations under the rule above stated is that the wounded man said on several occasions: "I can't stand it if this pain does not leave me soon." "If the pain does not leave me, I can't stand it much longer." After repeated questioning, bringing out the statements as above, the witness was again asked: "What did he say to you, a short time before he died, about dying,—as to whether or not he expected to die?" The answer given was: "He suffered so bad he could not stand. He must die." The language of the witness as given in the record does not make it entirely clear whether she intended by these words to repeat the precise expression made use of by her husband or to paraphrase and repeat the statement already given as above quoted. The latter, however, is made probable by the fact that immediately afterward, upon cross-examination, she was asked, "All that he said in regard to the matter was that if the pain did not let up or stop soon he could not stand it much longer"? and answered: "Those are the particular words he used, so near as I can recall it. That is all he said, so far as I can remember."

There is no other evidence whatever tending to show Sundblad's realization of the approach of death, except the inference, if any, to be drawn from the fact that he was desperately wounded, and in a state of collapse, from which death did ensue some hours later. We are impressed with the conviction that this is clearly insufficient. It

must not be overlooked that the admission of dying declar-
ations in any case is a marked exception to the general
rule which excludes hearsay testimony in all judicial ex-
aminations.   The accused, though upon trial for his life,
has no opportunity to confront or cross-examine the per-
son whose unsworn words are used against him, and it is a
recognized principle that such exceptional evidence be
admitted only where the preliminary showing that the
declarant was in fact *in extremis*, and had himself given
up all hope of recovery, is clear and unequivocal.   The
fact that the declarant realizes that he is in danger of
death, or believes that he must die if relief be not soon
administered, is not enough.   *Com. v. Brewer* (Mass.) 42
N. E. Rep. 92; *Reg. v. Osman* 31 Moak. 739; *Starkey v.
People*, 17 Ill. 17; *Brakefield v. State*, 1 Sneed, 215; *Er-
rington's Case*, 2 Lewin, Crown Cas. 148; *Bell v. State*, 72
Miss. 507, (17 South. Rep. 232); *Whitaker v. State*, 79 Ga.
87 (3 S. E. Rep. 403). • It is, of course, not essential to the
admissibility of dying declarations that the declarant
should have disclosed his abandonment of hope of recov-
ery in express words, although such proof, when obtain-
able, is the more satisfactory.   It may be inferred from
his condition and other circumstances making it morally
certain that he recognized not simply the danger, but the
fact of approaching death.   *State v. Keenan*, 38 La. Ann.
660; *State v. Wilson,* 24 Kan. 189 (36 Am. Rep. 257); *Peo-
ple v. Farmer*, 77 Cal. 1, (18 Pac. Rep. 800); *Rakes v.
People*, 2 Neb. 157; *People v. Simpson*, 48 Mich. 474 (12
N. W. Rep. 662).

Among the circumstances which may be considered as
tending to such conclusion, it may be shown that the de-
clarant had been informed by his physicians and friends
that his wound was mortal (*State v. Yee Wee*, (Idaho) 61
Pac. Rep. 588; *State v. Leeper*, 70 Iowa, 748; *People v.
Lonsdale*, 122 Mich. 388, 81 N. W. Rep. 277); that he sent
for a priest, and sought the consolations of religion ( *U. S.*

*v. Taylor,* 4 Cranch, C. C. 338 (Fed. Rep. Cas. No. 16,436);. *State v. Swift,* 57 Conn. 496 (18 Atl. Rep. 664) *State v. Nash,* 7 Iowa, 347.; *State v. O'Brien,* 81 Iowa, 88; *State v. Cantieny,* 34 Minn. 1, 24 N. W. Rep. 458); and that he made final distribution of his property by will or otherwise (*People v. Gray,* 61 Cal. 164, 44 Am. Rep. 549; *State v. Nash,* 7 Iowa, 347).

This enumeration is, of course, not exhaustive, but it is sufficient to indicate the nature and thoroughness of the preliminary inquiry which must precede the use of the declarations as evidence. In the present instance there is an entire absence of these *indicia* of the mental condition of Mr. Sundblad at the time of making the statements. given in evidence. The expression that "if the pain did not cease he could not stand it much longer,. or must die," by no means necessarily implies a belief on his part that he was past hope, but, on the contrary, contains the distinct intimation that, while conscious of being dangerously injured, he had not yet despaired of relief. The defendant's objections to the declarations should have been sustained.

VII. Following immediately upon the question just considered is the defendant's claim of error in the failure of the trial court to instruct the jury concerning the alleged dying declaration. The conclusion we have above announced, that the declarations ought not to have been admitted in evidence, would ordinarily render it unnecessary to consider this objection, but, in view of a retrial and the possibility that such declarations may then be shown competent, we think it advisable to examine the question thus raised.

9. SAME: instruction regarding.

An examination of the authorities reveals a lack of harmony upon this proposition. Some of the decided cases seem to hold that when the court, upon a preliminary investigation, has determined that the showing of declarant's dying condition and abandonment of hope of

recovery is sufficient to admit the declaration in evidence, the finding of such facts is conclusive, and must be so considered by the jury in deliberating upon their verdict. *Rex v. John*, 1 East P. C. 357; *State v. Burns*, 33 Mo. 483; *State v. Simon*, 50 Mo. 370; *Smith v. State*, 9 Humph. 9.

Another line of decisions hold, and we think with the better reason, that while it is for the court to pass upon the admissibility of the declaration in evidence the jury may be allowed to disregard it if upon the whole case they believe the declarant did not speak under a solemn consciousness of impending death. "The question of the admissibility of the dying declaration is in the first instance for the court, which must determine whether the declaration was made under the sense of impending death; but, if a *prima facie* case for the introduction of the declaration is established, it should be allowed to go to the jury, who will determine whether the circumstances under which it is shown to have been made were such as to justify its consideration." 1 McClain, Criminal Law, 430; *Dumas v. State*, 62 Ga. 58; *Mitchell v. State*, 71 Ga. 128; *Wallace v. State* (Ga.) 15 S. E. Rep. 700; *State v. Banister*, 35 S. C. 290 (14 S. E. Rep. 678). In *Com. v. Brewer*, 164 Mass. 577 (42 N. E. Rep. 92), the trial court was sustained in instructing the jury that they were not to consider the dying statement which had been given in evidence, unless they were "satisfied beyond a reasonable doubt that at the time the declarant made the statement he belived there was no hope of life." See, also, Roscoe, Criminal Evidence 34; 2 Starkie, Evidence, 263; 1 Greenleaf, Evidence, 160; *Starkey v. People*, 17 Ill. 17; *State v. Cameron*, 2 Pin. 490; *Poeple v. Wood*, 2 Edm. Sel. Cas. 71; *Com. v. Murray*, 2 Ash. 41; *Martin v. State*, 17 Ohio C. C. 406; *State v. Thawley*, 4 Har. 562; *State v. Seiley*, 41 La. Ann. 141, (6 South. Rep. 571.)

In *State v. Reed*, 53 Kan. 767 (37 Pac. 174, 42 Am.
St. Rep. 322), it was held error to instruct the jury that
the question whether deceased made the declaration in
the belief of impending death was for the court alone. It
is there said that, although the admissibility of the evi-
dence is exclusively for the consideration of the court,
yet "in passing upon the credibility of the statement the
jury are entitled to consider whether, as a matter of fact,
the deceased had lost all hope of recovery, and the in-
struction should have been modified in accordance with
this law." The confusion which is apparent in some of
the holdings seems to arise from the fact that courts have
at times lost sight of the distinction between the admissi-
bility of evidence and its credibility and application. It
often happens that testimony is competent and material
or otherwise, according as the jury may or may not find
the existence of certain other facts, and in all such in-
stances the court is required to instruct the jury under
what circumstances they may consider or refuse to con-
sider testimony so given.

A familiar illustration of the principle we believe ap-
plicable here may be found in the case of a party charged
with a crime alleged to have been committed in pursuance of
a conspiracy. Upon a *prima facie* showing of such unlawful
combination the court may admit the acts and statements of
an alleged co-conspirator as evidence against the party on
trial, but the admission of such evidence is not conclusive
of the existence of the conspiracy, and it is the court's
duty to instruct the jury that, unless they find the con-
spiracy has been proven, the testimony as to the acts and
statements of the third party must be eliminated from
their consideration in reaching their verdict. 2 McClain
Criminal Law, 989; *Loggins v. State*, 12 Tex. App. 65.
We think, therefore, that the preliminary decision by the
court goes simply to the admissibility of the evidence, and
that the jury is not only at liberty, but is bound, to take

into consideration all the testimony bearing upon the character of the alleged dying declaration, and the circumstances under which it was made; and, furthermore, that, in view of the peculiar and exceptional nature of such evidence, and the care with which the court restricts its admission and consideration, the jury should have explicit instruction in the premises.

VIII.    Exception is taken to the third paragraph of the court's instructions, defining reasonable doubt. Without setting it out in full, it may be said that as a whole it substantially follows the oft-quoted rule given in *State v. Ostrander*, 18 Iowa, 459, unless we are to except the clause reading as follows: "A doubt, to justify an acquittal, must be reasonable, and arise from a candid and impartial consideration of all the evidence in the case, and then it must be such a doubt as would cause a prudent and considerate man to hesitate and pause before acting in the graver and more important affairs of life." In the opinion of some members of the court, the expression, "to justify an acquittal," though it has the support of precedent, is unfortunate, and should be avoided, as being open to the interpretation that the jury starts with the primary obligation to convict the accused unless some reasonable doubt arises to justify a verdict of not guilty. Such meaning is, of course, not intended, and we may reasonably assume that the clause, when read as a part of the entire paragraph, is not prejudicial. The paragraph as a whole is in substantial accord with *State v. Pierce*, 65 Iowa, 85, and *State v. Elsham*, 70 Iowa, 531.

IX.    Among other things, the court charged the jury as follows:

"(7) One of the essential elements in the crime charged is the intent with which the act is committed. The rule of law is that a person who does an act intentionally necessarily intends the natural and usual consequence

of his act. Thus, if a man is seen, within shooting distance of another, to raise his gun and take aim and fire, and the man at whom he fires is seen to stagger, the ball having inflicted a mortal wound, the taking aim and firing such a weapon, if it be one from which death would likely ensue, would of itself be *prima facie* evidence that he intended the result of his acts, and it would therefore be a willful, deliberate, and premeditated killing.

"(8) I have deemed it proper, under the circumstances of this case, to call your attention to the foregoing general principles of law relating to felonious homicide, and you are instructed that in determining this case you should apply these principles to the evidence produced upon the trial; and in relation thereto you are instructed that if at the time charged in the indictment, and in the county of Buena Vista and state of Iowa, you find that the defendants willfully, deliberately, and premeditatedly shot the said John Sundblad, thereby inflicting a wound whereof he died, malice would be presumed from such act, and the defendants would be guilty of murder in the first degree.

"(9) Murder in the first degree, under our law, is that which is perpetrated by any willful, deliberate, premeditated killing; and if you find from the evidence that the defendants, while within shooting distance of John Sundblad, were seen to raise a gun or revolver, take aim in the direction of said John Sundblad, and to fire said revolver, and the said John Sundblad was seen to stagger, and if you further find that the ball from said gun or revolver inflicted a mortal wound of which he, the said Sundblad died, the fact of taking aim and firing such a weapon as aforesaid would of itself be *prima facie* evidence of a willful, deliberate, and premeditated killing, in the absence of evidence to the contrary, and, if you so find beyond a reasonable doubt, then you would be

warranted in finding that the defendants, or defendant who did the act, guilty of murder in the first degree."

The thought here expressed, if we correctly interpret it, is that the aiming and firing of a gun with fatal effect upon the person thus assaulted is, "of itself" evidence of an intent to kill, and "therefore of a willful, deliberate, and premeditated killing," or murder in the first degree. This, we think, cannot be the law. Indeed, the great weight of authority is that proof of intentional homicide, without circumstances of mitigation or excuse, affords a presumption of malice, and therefore of murder; but that presumption is of murder in the second, not in the first degree. *Dains v. State*, 2 Humph. 439; 21 Am. & Eng. Enc. Law, 163-170; 1 McClain, Criminal Law, 365. It is true we are permitted to infer that one who shoots and kills another intends the fatal result thus produced; but to go further, and say that, having thus found the intent, we may therefrom draw the inference of deliberation and premeditation is to make one inference the basis of another, which is a violation of the fundamental principles of evidence. *U. S. v. Ross*, 92 U. S. 281 (23 L. Ed. 707).

*[margin note: II. MURDER: intent: premeditation: instruction.]*

The seventh instruction, above quoted, seems to go to the extent of holding that intent to kill necessarily implies deliberation and premeditation. Literally construed, it makes murder in the first degree of every intentional homicide. In this we cannot concur, for the intent to kill is not necessarily inconsistent with the crime of manslaughter or murder in the second degree. *Hornsby v. State*, 94 Ala. 55 (10 South. Rep. 522); *State v. McGuire* 87 Iowa, 142; *Erwin v. State*, 29 Ohio St. 186 (23 Am. Rep. 733); *State v. Henderson*, 24 Or. 100 (32 Pac. Rep. 1030). This is not to deny the rule that where homicide has been intentionally committed, and there is shown to have been no combat, sudden quarrel, or other provocation inducing or explaining the criminal act, the jury may therefrom

find deliberation and premeditation. In such cases, however, the finding of deliberation and premeditation is not reached from the intentional killing alone, but from such killing, together with the affirmative showing of an absence of all circumstances tending to indicate the lower degree of offense.

The instruction upheld in *State v. Gillick*, 7 Iowa, ·.10, and on which the one before us was evidently modeled, means no more than this when interpreted in the light of the facts there presented, and the subsequent holding of this court in *State v. McCormick*, hereinafter referred to. There are cases, doubtless, to which the instruction in the *Gillick Case* may properly be applied, but the homicide we are. considering is not embraced within that class. A vigorous battle with deadly weapons was going on, beginning with the advance of the posse upon the suspected men, followed by a siege of the station, and a running fight into the open country. All these things, together with the attempted arrest and the manner and circumstances thereof, have an intimate bearing upon the question of deliberation and premeditation, and should not have been divorced therefrom in the submission to the jury. Whatever may be the rule in the absence of any combat, it cannot be said that where parties armed with loaded guns are arrayed against each other, firing rapidly back and forth, with evident deadly intent, any presumption of premeditation and deliberation arises from the mere fact that one of the persons so contending is seen to shoot and kill an antagonist. Applying the rule that malice, which is the criterion of murder, may be inferred from the mere fact of intentional killing, proof of a homicide under such circumstances, in the absence of any question of self defense, will justify a conviction of murder in the second degree. The inference, so far as inference in such cases may be allowed, is of murder in the second degree, leaving it to the state to establish, if it

can, the elements of deliberation and premeditation nec-
essary to raise the crime to the first degree, and to the de-
fendant to reduce it.to manslaughter if he can by rebut-
ting the presumption of malice.    21 Am. & Eng. Enc. Law,
170; *People v. White*, 24 Wend. 520; *Thomas v. People*,
67 N. Y. 221; *State v. Herrell*, 97 Mo. 105 (10 S. W. Rep.
387, 10 Am. St. Rep. 289); *State v. Norwood*, 115 N. O.
789 (20 S. E. Rep. 712, 44 Am. St. Rep. 498); *Schlencker
v. State*, 9 Neb. 300 (2 N. W. Rep. 710).

Our position in this connection is borne out by the
well-considered opinion of Dillon, J., in *State v. Mc-
Cormick*, 27 Iowa, 413. It was there held error to instruct
the jury that proof of killing, without more, raises a pre-
sumption that it was done willfully, deliberately, and
premeditatedly. Referring to said instruction, the opin-
ion says the killing alone "does not raise the presumption
that the defendant is guilty of murder in the first degree.
The instruction tells the jury that if they find the de-
fendant killed the deceased the law presumes not only
that he intended to kill him, but that he did it willfully,
deliberately, and premeditatedly. This is stating the rule
too broadly and too strongly. It is suggested that there
are cases which will support this instruction. If so, we
cannot follow them."

X.    Error is assigned upon the giving of the tenth in-
struction, reading as follows:

"(10) In order to determine whether an act is premed-
itated, you are instructed that you are to determine from
all the circumstances in the case as proven whether the
act of killing, if you find there was such an act committed,
was performed with premeditation; and in this con-
nection you are told that when it has been shown
beyond a reasonable doubt that the defendants formed
in their own mind the purpose to maliciously kill,
the length of time between the forming of such purpose
or design in the mind and the execution of such purpose

or design is immaterial. If you believe from the evidence beyond a reasonable doubt that a purpose or design to kill was distinctly formed in the minds of the defendants at any moment before, or even at the time, a revolver was fired by the defendants or either of them, but long enough prior to the shooting to admit of deliberation and premeditation, if any such revolver was fired at Sundblad, and did kill him, it was willful, deliberate, and premeditated killing, and therefore murder in the first degree, and you should convict the defendants of murder in the first degree as charged in the indictment; and you are further instructed that, if but one of the defendants was guilty of the act of shooting which caused the death of said John Sundblad, still, if you find that the other defendants were present aiding, abetting, and encouraging and assisting in the commission of the crime, then both of the defendants would be equally guilty of the crime charged."

As said in reference to the instructions already considered, we think this paragraph fails to observe the proper distinction between the degrees of murder. The effect of the rule here stated is that if the purpose to kill was formed in the mind of the defendants any length of time before or even at the instant of firing the fatal shot, and the jury find there was time in which they might have exercised deliberation and premeditation, then the conclusion of the existence of such deliberation and premeditation follows as a matter of law. Killing in pursuance of a malicious purpose is murder, but without proof of other facts it is, as we have seen, murder in the second degree. The additional facts or elements necessary to sustain a conviction of the first degree—deliberation and premeditation—must be established by the evidence; they cannot be inferred from the wrongful intent or malicious purpose, for to do so would be to require the state to do no more than prove the lower degree, and permit the jury therefrom to convict

12. PREMEDITATION: jury question.

of the higher degree.    These distinguishing elements
of the higher degree of the crime are fact elements to be
found by the jury, and it is not within the province of
the court to say that the fact of deliberation or premedit-
ation is conclusively established by the proof of any other
fact.    It is doubtless true that if the jury believe there
was time to exercise deliberation or premeditation they
may therefrom, in view of all the circumstances, conclude
that it was in truth exercised; but the conclusion, when
reached, must be the judgment of the jury.

The latter clause of this instruction, which directs the
jury that if Sundblad was killed by one of the defendants,
and the other defendant aided or abetted in the wrongful
act, both are equally guilty, is not in harm-
ony with our holding in *State v. Smith,* 100
Iowa, 1.    We there said: 'The guilt of a per-
son who aids or abets the commission of a crime must be
determined upon the facts which show that he had a part
in it, and does not depend upon the degree of another's
guilt.    *    *    *    The shot which endangered the sheriff was
fired by John T. Smith (the defendant's brother).    He
may have fired it with such premeditation and malice as
to have committed the offense of assault with intent to
commit murder, yet defendant may have abetted or coun-
seled it in the heat of passion, and thus have been guilty
of assault with intent to commit manslaughter.''  The clause
of the instruction above referred to states the contrary
doctrine, and is therefore erroneous. The liability of an aider
or abettor differs materially from that of a co-conspirator.
*State v. Smith, supra; State v. Wolf,* 112 Iowa, 458.

XI.    The legality of the arrest or attempted arrest by
the marshal and his posse is elaborately argued by coun-
sel, and was the subject of several paragraphs of the
court's charge to the jury.    The theory of
the appellants is, first, that the marshal, hav-
ing no warrant, was without any authority to

make the arrest; and, second, that even if the authority existed it was exercised in an unlawful manner, and thereby provoked the fight in which Sundblad was killed. A public officer may make an arrest without warrant whenever a public offense has been committed, and he has reasonable ground for believing that the person to be arrested has committed it. Code, section 5196. A private citizen may exercise like authority when a felony has been committed. Code, section 5197. The question whether a felony had been committed and whether Lodine had reasonable ground to believe the defendants to be the guilty parties was for the jury. We think it was sufficiently clear that a felony had been committed by some one. The defendants' complicity in that crime is not open to doubt. The marshal, upon a somewhat uncertain and fugitive rumor of such offense, had his suspicion directed to the men in the waiting room of the station, and undertook their arrest. Had it proved that no crime was in fact committed, or that the defendants were wholly innocent thereof, it would doubtless have been very difficult for him to defend an action for damages for wrongful arrest. But so long as the rumored offense was in fact committed, and the parties arrested were in fact guilty thereof, the truth, when ascertained, should be held sufficient justification of the act of the officer. In other words, if an officer makes an arrest upon insufficient information he acts at his peril, and assumes the risk of being held in damages to an innocent person thus injured; but if a felony has been committed, and the officers seize the guilty party without undue violence, he does no wrong. In each case the information upon which he acted is immaterial. It would be an anomalous proposition to hold an officer chargeable with wrong in arresting the right man; assuming, of course, that the arrest be made in a proper and lawful manner.

The manner in which the marshal and his assistants undertook to seize the defendants and Dolan presents a

less clear question.    The statute provides (Code, section 5199) that a person making an arrest must inform the person to be arrested of the intention to arrest him and of the cause thereof, and require him to submit to custody.  No particular form of words is prescribed, but the information is to be given to the person accused, and opportunity given him to submit in an orderly and peaceable manner, unless good reasons appear for the omission of such duty.   It is doubtless true that under some circumstances, as where the accused person is fleeing from the officer, or is making active resistance, these formalities need not be strictly observed.    That the marshal's party acted in the highest good faith as citizens, desiring to vindicate the law, cannot be questioned; and if the defendants knew, or as reasonable men should have known, that nothing but their arrest was sought, and no bodily harm was intended, then they could not justify the use of deadly weapons in resistance, even though the arrest was unlawful.    On the other hand, if the posse, even though acting in good faith and with no intention of violating the law, suddenly advanced upon the accused with loaded guns, presented in a threatening manner, thereby impressing the latter, as reasonable men, with the belief that they were about to suffer great bodily harm, or be placed at the mercy of an angry mob, then they had the right to resist, and employ such force as was reasonably adequate to defend themselves against the attack, without regard to their guilt of the charge upon which their arrest was sought.  The language, "Hands up! Hands up!" or "Hands up!  We want you!" emphasized with rifles, shotguns, and revolvers, may, of course, be used with the idea that the party thus addressed is required to subject to arrest, but it must be admitted that to the average mind it ordinarily conveys a much more uncomfortable suggestion.

15. ARREST: threatened violence: right of accused to resist.

The defendants, even though charged with burglary, were entitled to the protection of the law and a trial in due course of criminal procedure, and if exposed, or if as reasonable men, in view of the display of force against them, they believed themselves exposed, to personal violence, neither the fact of their guilt, if guilty, nor of the honesty of purpose of the marshal and his party, would deprive them of their right to resist. Such rightful resistance is, of course, proportioned to the danger to be avoided, and if in the heat of combat thus occasioned it is carried beyond that limit, and death is thereby caused, the crime will be murder in the second degree or manslaughter, according as malice may or may not be found to characterize the wrongful act. Even a legal arrest, whether with or without warrant, may be attempted in such a violent and menacing manner that, if death result to the officer in the heat of a struggle thus excited, the killing will not be murder in the first degree. As bearing upon the several points here suggested, see *Rex v. Ricketts*, 3 Camp. 68; *Tiner v. State*, 44 Tex. 128; *Bellows v. Shannon*, 2 Hill, 86; *Rafferty v. People*, (Ill.) 18 Am. Rep. 601; *Jones v. State*, (Tex. App.) 8 S. W. Rep. 801, 8 Am. St. Rep. 454; *Wright v. Com.*, 85 Ky. 123 (2 S. W. Rep. 904); *Starr v. U. S.*, 153 U. S. 614 (14 Sup. Ct. Rep. 919, 38 L. Ed. 841); *Croom v. State*, 85 Ga. 718 (11 S. E. Rep. 1035, 21 Am. St. Rep. 179); *State v. Mahon*, 3 Har. 568; Wharton, Criminal Law; *Golden v. State*, 1 S. C. 292; *Minniard v. Com.*, 87 Ky. 213 (8 S. W. Rep. 269); *Drennan v. People*, 10 Mich. 169.

The trial court instructed the jury quite clearly upon the general principles here discussed, but in making reference to the case on trial said to the jury that if the offi-
16. ARREST: cer, upon reasonable information and belief
resistance:
instruction. of the defendant's guilt, "summoned a posse of citizens, and with them, armed with guns and revolvers, went to the depot where the defendants were at the time, and with and in the presence of the posse called upon the

defendants to throw up their hands, and informed them that he wanted them, "then the resistance was unlawful, and if, in makng such defense, Sundblad was killed, then defendants were guilty as charged." To make such rule applicable the jury should have been charged they must also find that defendants knew, or as reasonable men ought to have known, that their arrest was sought by lawful authority, and that their personal safety was not being imperiled at the hands of the arresting force. The defendants were, so far as appears, entire strangers in the neighborhood; there is no evidence that they knew the official character of Lodine; the demand made upon them did not necessarily mean a summons to submit to lawful arrest; the demonstration of force against them was such as would amount to an assault if made without proper authority; and it should have been left to the jury to say whether defendants were sufficiently apprised of the lawful purposes of the marshal and his party.

Other questions are raised by counsel, but, in view of the conclusions already announced, it is unnecessary to consider them. The judgment of the district court is reversed, and the cause remanded for a new trial.—REVERSED.

DEEMER, J. (dissenting).—I think the declaration made by Sundblad immediately before his death, as to who shot him, was properly admitted in evidence, and, had the trial court given a proper instruction with reference to dying declarations, there would have been no error with respect to the admission of this item of evidence.